Donald & Shirley TROWBRIDGE, and
Larry & Beverly Hamilton,
Appellants–Plaintiffs,

v.

Tom & Sara TORABI, Appellees–
Defendants.

No. 64A03–9706–CV–221.

Court of Appeals of Indiana.

April 9, 1998.

Rehearing Denied May 21, 1998.

Michael A. Langer, Langer & Langer, Valparaiso, for Appellants-Plaintiffs.

Gordon A. Etzler, Tina M. Bengs, Hoeppner Wagner & Evans, Valparaiso, for Appellees-Defendants.

## OPINION

FRIEDLANDER, Judge.

In this interlocutory appeal, Donald and Shirley Trowbridge and Larry and Beverly Hamilton appeal from an order granting partial summary judgment in favor of Tom and Sara Torabi. The following restated issue is presented in this appeal:

> Did the trial court err in granting partial summary judgment in favor of the Torabis and in determining that the laws pertaining to property and water rights are applicable and those pertaining to nuisance are inapplicable?

We reverse and remand.

The Torabis own land adjacent to and immediately east of lots 16 and 17 of the Tanner Trace subdivision in Valparaiso, Indiana. The Trowbridges own lot 16 and the Hamiltons own lot 17. A single pond [1] is located on all three properties, but it is principally located on the Torabis' property. In order to gain access to a landlocked part of their property, the Torabis constructed, in 1995, a stone driveway across the pond. The driveway, with a twelve-inch culvert at the bottom,

---

1. All the parties characterize the body of water at issue in this case as a "private pond." *See, e.g.,* Appellants' Brief at 9; Appellees' Brief at 10. The Trowbridges and Hamiltons characterized the pond as a "common private pond", and the Torabis, in their answer, denied the existence of a common pond and that they purchased an interest in a common pond with the Trowbridges or the Hamiltons. Nonetheless, in their reply brief in support of their motion for summary judgment and on appeal, the Torabis admitted that a small portion of the pond is located on the Trowbridges' and Hamiltons' properties and that, based upon case law, the Trowbridges and Hamiltons have a right to utilize that portion of the pond which is on their properties.

was located entirely within the boundaries of the Torabis' property.

The Trowbridges thereafter filed a complaint for damages against the Torabis, alleging nuisance *per accidens* and trespass. They alleged that the driveway construction caused them annoyance and discomfort and also caused destruction of an oak tree on their property. They also alleged that stones from the driveway sporadically entered their property. The Trowbridges also alleged that the twelve-inch culvert constructed beneath the driveway was of insufficient size and seriously restricted the flow of water to that portion of the pond lying on their property, causing stagnation of the pond. They further alleged that the fair market value of their property decreased as a result of the driveway construction.

The Trowbridges sought abatement of the nuisance at the Torabis' expense, the removal of all stones on their property as a result of the construction and existence of the Torabis' driveway, and the removal of the matter they alleged had accumulated on the surface of the pond because of the restriction in the flow of water from the Torabis' portion of the pond due to the improperly sized culvert.

The Trowbridges also sought injunctive relief in the event the Torabis did not abate the nuisance. They requested an order compelling the Torabis to remove the driveway.

The Trowbridges also sought money damages as compensation for the oak tree that was destroyed, the decrease in the fair market value of their property, the interference with the use of their property, the replacement or repair of their septic system, the removal of the driveway, the installation of a culvert sufficient to allow the free flow of water from the Torabis' portion of the pond to their portion of the pond, and for annoyance, discomfort, and inconvenience. They also sought an award of reasonable attorney fees.

The Torabis filed a counterclaim against the Trowbridges and a cross-claim against the Hamiltons. The Torabis also filed a motion for partial summary judgment, alleging that there was no genuine issue of material fact and that they were entitled to judgment as a matter of law.

One of the materials designated to the trial court in support of the motion for summary judgment was a deposition of George Tanner, a developer of the Tanner Trace subdivision and the predecessor in interest of the land owned by the Trowbridges and Hamiltons. In 1948, Tanner and his brother inherited from their parents eighty-seven acres of land upon which the Tanner Trace subdivision was ultimately developed. Tanner had lived on the property his entire life and had farmed a portion of the land.

According to Tanner, in the 1940's, Ed Anderson built a dam and a spillway on his property, which is the property now owned by the Torabis, in order to form a pond. The pond was fed by rain water, springs, and drainage from field tile. Anderson used the water in the pond for crop irrigation.

The spillway from the pond on Anderson's property afforded a fairly adequate flow of water onto Tanner's property in the fall and on an on-and-off basis during the winter and spring. The flow of water would sometimes dry up in the summertime. Tanner described the area of his property onto which the water would flow as "a low, swampy area that was created by the water seeping from and flowing over from the dam that Ed had." *Supplemental Record* at 179. According to Tanner, that area of his property did not contain water of a significant depth. Rather, it was merely wet ground that, at times, dried up.

When Tanner was first platting the Tanner Trace subdivision, which was probably sometime in 1975, the land east of Tanner's property, which is now owned by the Torabis, was owned by Wallace Hanrahan. Sometime during the planning stages of the Tanner Trace subdivision, Hanrahan sold the property to Jim and Shirley Kissinger. According to Tanner, water drained downstream from the Kissingers' property in a northwesterly direction across his property. Tanner later testified that there was also drainage into the pond from the southeast quadrant of the Kissingers' property and, to a lesser extent, from the south, southwest, and northwest corners of his property.

When the initial subdivision plans for the Tanner Trace subdivision were being made, Tanner met with the Kissingers and discussed with them his tentative plan to pay for a dam and standpipe to be built on his property in order to expand the pond. Tanner allowed the Kissingers to decide the depth of the pond, which was to be about four-feet deep. Tanner and the Kissingers orally agreed to the construction project, but apparently there was a misunderstanding about who was to pay to remove the dam built by Anderson. In any event, the dam built by Anderson was removed in 1975, pursuant to Jim Kissinger's instructions, when a contractor hired by Tanner constructed the dam and standpipe on Tanner's property. While there is no question that the dam and standpipe constructed in 1975 resulted in an increase in the overall depth of the pond and an enlargement of the west side of the pond, there is a dispute between the parties with regard to whether, before the 1975 dam was built, the pond was located on the land eventually owned by the Trowbridges and Hamiltons.

Tanner subsequently sold the subdivided lots 16 and 17 to the Trowbridges and Hamiltons. The Trowbridges purchased their property from Tanner in June 1976.

It appears from the record that the Kissingers sold their property to the Torabis sometime in 1994. After the Torabis constructed their driveway over the pond in 1995, the Trowbridges initiated this suit, alleging that, as a result of the driveway construction, the portion of the pond located on their property became stagnated and they were no longer able to enjoy its use.

The trial court granted the Torabis's motion for partial summary judgment, ordering:

1. That the laws of property rights and water rights apply and not the law of nuisance.

2. That the Defendants' roadway across the pond was properly constructed on Defendants' property and excepting for liability for the tree damage and the roadway materials that sloughed off onto Plaintiffs' property, Defendants are not liable to Plaintiffs for roadway construction.

*Record* at 98.

The standard used to review whether summary judgment was properly granted is well settled:

Summary judgment is proper only where the pleadings, depositions, answers to interrogatories, admissions, matters of judicial notice, and other matters presented for consideration on the motion reveal that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* Ind.Trial Rule 56(C). Once the moving party establishes that no genuine issue of fact exists, the non-moving party must set forth specific facts indicating that there is a genuine issue in dispute. If the non-moving party fails to meet this burden, summary judgment in favor of the moving party is appropriate.

The party moving for summary judgment must designate to the court all matters in the record on which it relies for the motion. The non-moving party must also designate to the court "each material issue of fact which that party asserts precludes entry of summary judgment and the evidence relevant thereto." Ind.Trial Rule 56(C). All properly asserted facts and reasonable inferences must be construed in favor of the non-moving party, and any doubt as to the existence of a factual issue must be resolved against the moving party.

*McIntyre v. Baker,* 660 N.E.2d 348, 349 (Ind. Ct.App.1996) (citations omitted). In addition, all facts properly designated by the party opposing the motion must be accepted as true. *Shackelford v. Rice,* 659 N.E.2d 1142 (Ind.Ct.App.1996), *trans. denied.*

■ Using the above standard, we conclude that the trial court erred in granting summary judgment in favor of the Torabis because genuine issues of material fact exist. Because such issues of fact exist, we cannot properly review on the record before us whether the trial court erred in determining that the laws pertaining to property and water rights are applicable and that the law pertaining to nuisance is not.

■ The Torabis support their argument before this court, just as they did before the trial court, with case law pertaining to various types of water, including surface water, ponds, and natural watercourses. Different "water rights" attach depending on whether water is classified as a private pond, a common private pond, a natural watercourse, or mere surface water. Accordingly, the classification of the body of water in this case is an issue of fact or at least an issue of law which depends on the resolution of factual issues which cannot be resolved on the present record.

■ If the body of water at issue in this case is mere surface water, case law is clear that nuisance law is inapplicable. *See Pickett v. Brown,* 569 N.E.2d 706 (Ind.Ct.App.1991), *trans. denied* (one may not circumvent the well-settled law in Indiana regarding surface water by characterizing an action for the recovery of damages caused by the flow of surface water as one based upon a nuisance). If it is a private pond, a common private pond, or a natural watercourse, then nuisance law may apply. We have been presented with no Indiana case which specifically speaks to whether nuisance law may be applied to actions seeking recovery of damages caused by the flow or obstruction of water in ponds, natural watercourses, or any other type of water besides surface water. While the Torabis argued to the trial court and also argue before this court that the holding in *Pickett* may be applied to ponds such as the one at issue in this case, a close reading of *Pickett* reveals that its holding is limited only to water which is classified as surface water.

■ Our research reveals a clear distinction between water classified as surface water and water classified as a pond or a watercourse. The term "surface waters" is defined as follows:

As distinguished from the waters of a natural stream, lake, or pond, surface waters are such as diffuse themselves over the surface of the ground, following no defined course or channel, and not gathering into or forming any more definite body of water than a mere bog or marsh. They generally originate in rains and melting snows, but the flood waters of a river may also be considered as surface waters if they become separated from the main current, or leave it never to return, and spread out over lower ground. Water derived from rains and melting snows that is diffused over surface of the ground, and it continues to be such and may be impounded by the owner of the land until it reaches some well-defined channel in which it is accustomed to, and does, flow with other waters, or until it reaches some permanent lake or pond, whereupon it ceases to be "surface water" and becomes a "water course" or a "lake" or "pond," as the case may be.

Black's Law Dictionary 1427 (5th ed. 1979) (emphasis supplied). Surface water has also been defined simply as "water which is diffused over the natural slope of the ground, not following a defined course or channel." *Gasway v. Lalen,* 526 N.E.2d 1199, 1201 (Ind.Ct.App.1988).

■ Under the common enemy doctrine of water diversion, it is not unlawful for a landowner to improve his land in such a manner as to accelerate or increase the flow of surface water by limiting or eliminating ground absorption or changing the grade of the land. *Argyelan v. Haviland,* 435 N.E.2d 973 (Ind.1982); *Pickett,* 569 N.E.2d 706. The right to so improve one's land is not altered even where the land is so situated to the land of an adjoining owner that the improvement will cause water either to stand in unusual quantities on adjacent lands or to pass into or over adjacent lands in greater quantities or in other directions than the waters were accustomed to flow. *Pickett,* 569 N.E.2d at 709.

This court, quoting from *Capes v. Barger,* 123 Ind.App. 212, 214–15, 109 N.E.2d 725, 726 (1953), defined the term "surface water", distinguished it from a natural watercourse, and discussed the applicability of the common enemy doctrine, stating:

Water from falling rains or melting snows which is diffused over the surface of the ground or which temporarily flows upon or over the surface as the natural elevations and depressions of the land may guide it

but which has no definite banks or channel, is surface water.

If the natural depressions and elevations of the land form a way for water but such way has no well defined banks or channel and carries no water except that which drains into it from adjoining lands in wet seasons or as a result of freshets, then such way is not a natural water course but a mere surface drain and falls within the doctrine that surface water is a common enemy which any proprietor may combat as best he can.

*Kramer v. Rager*, 441 N.E.2d 700, 705 (Ind. Ct.App.1982) (citations omitted).

Our supreme court in *Argyelan* defined the "common enemy doctrine" as follows:

In its most simplistic and pure form the rule known as the "common enemy doctrine," declares that surface water which does not flow in defined channels is a common enemy and that each landowner may deal with it in such manner as best suits his own convenience. Such sanctioned dealings include walling it out, walling it in and diverting or accelerating its flow by any means whatever.

*Argyelan*, 435 N.E.2d at 975. Thus, if the water at issue here is mere surface water, then the common enemy doctrine would allow the Torabis to go so far as to completely wall it in, even if such action resulted in the Trowbridges and Hamiltons being completely deprived of the use and enjoyment of the water.

On the other hand, because the common enemy doctrine only applies to surface water, if the water here is a pond or a natural watercourse, then the common enemy doctrine would not apply.

■ The term "pond" is defined as "[a] body of stagnant water without an outlet, larger than a puddle and smaller than a lake; or a like body of water with a small outlet." Black's Law Dictionary 1044 (5th ed. 1979). A "private pond" is defined as "[a] body of water wholly on the lands of a single owner, or of a single group of joint owners or tenants in common, which did not have any such connection with any public waters that fish could pass from one to the other." *Id.* See

*also Sanders v. DeRose*, 207 Ind. 90, 191 N.E. 331, 332 (1934) ("private pond" describes "a body of water wholly upon the land of a single owner or group of owners and not connected with any public waters of the state"). In *Sanders*, which involved an inland, nonnavigable lake, the court set forth the common law rule that "each owner has the right to the free and unmolested use and control of his portion of the lake bed and water thereon for boating and fishing." *Sanders*, 191 N.E. at 333. This common-law rule was recently applied by this court in *Berger Farms, Inc. v. Estes*, 662 N.E.2d 654 (Ind.Ct.App.1996). Thus, if the well-established common-law rules applicable to a small nonnavigable lake may be applied with equal force to a pond, and if the body of water at issue in this case is either a private pond or a common private pond, then nuisance law may be applicable.

Likewise, if the water at issue in this case is a natural watercourse, then nuisance law may apply. While we entertain serious doubts that the water with which we are concerned is a natural watercourse, such is not inconceivable. In addition, the Torabis cited case law pertaining to natural watercourses in arguing to the trial court that partial summary judgment in their favor was appropriate, but we question the Torabis' representations of the common law as it relates to the rights of upper and lower landowners to obstruct or interfere with natural watercourses. We will therefore discuss natural watercourses and the water rights associated with them.

■ The broad rule of nonliability for warding off surface water from one's land does not extend to a case where a natural or prescriptive watercourse is obstructed or interfered with to the damage or injury of another. *Schlichter v. Phillipy*, 67 Ind. 201 (1879); *Vandalia R. Co. v. Yeager*, 60 Ind. App. 118, 110 N.E. 230 (1915). In *Vandalia*, this court stated:

A water course is a channel cut through the turf by the erosion of running water, with well-defined banks and a bottom, and through which water flows and has flowed immemorially, not necessarily all the time,

but ordinarily and frequently for substantial periods each year.

110 N.E. at 233. In *Gasway,* 526 N.E.2d at 1201 (citations omitted), this court, discussing an issue pertaining to a natural watercourse, stated:

> Water flowing in a defined channel or watercourse is not surface water and the common enemy doctrine is inapplicable. The law pertaining to natural watercourses prohibits a lower landowner from blocking or obstructing the natural flow of water through a watercourse. A natural watercourse is defined as a course or channel consisting of well defined banks and a bottom through which water flows in a definite direction for a substantial period each year. The size of the watercourse is immaterial as is the necessity of a constant water flow. It is sufficient that water from heavy rains is regularly discharged through a well defined channel in order to constitute a natural watercourse.

▮ While it is often said that a watercourse must have a defined bed and banks made by the action of the water, these criteria are not exclusive. *Birdwell v. Moore,* 439 N.E.2d 718 (Ind.Ct.App.1982). Whether a watercourse exists must be determined from the applicable facts. *Id.*

▮ It is well established that "[a] property owner who receives water by way of a natural watercourse may not obstruct the natural flow of the watercourse to cast the water back on the upper proprietor." *Birdwell,* 439 N.E.2d at 721. It is also well settled that injunctive relief is available to protect a landowner's right to an unobstructed flow of water in a natural watercourse. *Gasway,* 526 N.E.2d 1199. The Torabis argued to the trial court and also argue on appeal that *Gasway* provides that a lower landowner may not obstruct the flow of a natural watercourse, but that an upper landowner may do so without liability to the lower landowner. *Gasway* actually states: "The law pertaining to natural watercourses prohibits a lower landowner from blocking or obstructing the natural flow of water through a watercourse." *Gasway,* 526 N.E.2d at 1201. It does not state, or even imply, that an upper landowner may, without liability,

take any action whatsoever to block the flow of a natural watercourse, and our research reveals no case law which stands for such a proposition.

▮ It is well established that a landowner may improve his land in any way to combat surface water, but that "owners of lands may not obstruct watercourses to the injury of others". *Schlichter,* 67 Ind. at 205. Case law is clear that a lower landowner cannot obstruct a natural watercourse to the detriment of the upper landowner. Nonetheless, *Gasway* does not provide support for the proposition that an upper landowner can properly obstruct a watercourse where such obstruction causes injury to others, and the Torabis have not directed us to another case which supports such a proposition.

A genuine issue of material fact exists with regard to whether the Torabis are liable for the alleged damage to the Trowbridge and Hamilton properties. Specifically, as set forth above, if the water involved is mere surface water, then, pursuant to the common enemy doctrine, the Torabis are not liable for the alleged damage to the Trowbridge and Hamilton properties, and the Trowbridges and Hamiltons may not circumvent the well-settled laws pertaining to surface waters by characterizing their cause of action as one based upon a nuisance. On the other hand, if the water is a common private pond and not mere surface water, then the Trowbridges and Hamiltons are entitled to the use of the pond located on their respective properties, and the Torabis may be liable for damages based upon a nuisance theory if their construction of a driveway over the pond interfered with the Trowbridges' and Hamiltons' comfortable enjoyment and use of their portions of the pond. *See* Ind.Code Ann. § 34–1–52–1 (West 1983) ("[w]hatever is injurious to health, or indecent, or offensive to the senses, or an obstruction to the free use of property, so as essentially to interfere with the comfortable enjoyment of life or property, is a nuisance, and the subject of an action"). In addition, if the water is a private pond located entirely upon the Torabis' land or if the water is a natural watercourse, then

other rules pertaining to "water rights" apply.

Until a determination of the character of the water at issue is made on the basis of a more complete record than that presented to this court, we cannot adequately review whether the trial court was correct when it determined that the law of nuisance was inapplicable and that, except as to tree damage and sloughed-off roadway materials, the Torabis were not liable to the Trowbridges and Hamiltons for construction of the driveway. We therefore reverse the grant of partial summary judgment and remand this case to the trial court for further proceedings consistent with this opinion.

Judgment reversed.

SULLIVAN and KIRSCH, JJ., concur.