B & B, LLC, Appellant–Plaintiff,

v.

**LAKE ERIE LAND COMPANY,**
Appellee–Defendant.

No. 45A04–1002–PL–183.

Court of Appeals of Indiana.

Feb. 28, 2011.

R. Brian Woodward, Mindy J. Heidel, Casale, Woodward & Buls, LLP, Merrillville, IN, Attorneys for Appellant.

David L. Abel II, Valparaiso, IN, Attorney for Appellee.

**OPINION**

BAKER, Judge.

In this case of first impression, we consider whether a landowner, who raises the subterranean water table on his land and creates a federally regulated wetland, may invoke the common enemy doctrine of water diversion and shield himself from liability to adjoining landowners whose property also became federally regulated wetlands? We answer this question in the negative and conclude that the trial court erroneously granted the defendant-landowner's motion for a judgment on the evidence.

Appellant-plaintiff B & B, LLC (B & B) appeals the trial court's grant of judgment on the evidence with regard to its claims against appellee-defendant Lake Erie Land Company (LEL) for trespass, nuisance, and negligence. Specifically, B & B maintains that the order granting LEL's motion for judgment on the evidence cannot stand because LEL failed to raise the common enemy doctrine as an affirmative defense in the pleadings and at trial. B & B also argues that the trial court misconstrued the evidence and improperly applied the common enemy doctrine in these circumstances. Moreover, B & B maintains that the trial court erred in determining that LEL did not commit an act of trespass as a matter of law and that the evidence clearly demonstrated that LEL breached a duty that it owed to it.

We conclude that the defense of the common enemy doctrine was properly raised and presented at trial. However, we find that the trial court erred in determining that that B & B's action was barred by the common enemy doctrine and that its claims against LEL should have been permitted to proceed. Thus, we reverse the trial court's grant of LEL's motion for judgment on the evidence and remand for further proceedings consistent with this opinion.

*FACTS* [1]

In 1996, Robert Pruim purchased approximately 280 acres of land in Lake Station. For thousands of years, this land, which was located near Little Calumet River, was swampy and unusable. Sometime in the 1920s, a ditch (Burn's Ditch) was built along the river's path to drain the land. Burn's ditch runs from Little Calumet River in Gary to Lake Michigan in Portage. The effect of Burn's ditch lowered the water table four or five feet. Several farmers also placed field tiles at various locations that were placed two to four feet deep in the ground. The land was farmed from the 1920s until the 1990s.

Pruim and his business partner, Raymond Tressmer, desired to build a waste transfer station for garbage and develop the remainder of the property as an industrial park. The transfer station was to be built at the northwestern corner of the site.

During the course of the transfer station development, wetland issues developed that had to be resolved through the Army Corps of Engineers (Army Corps). As a result, the Army Corps issued a citation for the potential wetland violation.

Thereafter, Pruim hired J.F. New (New), a national resources consulting firm, that assists clients in obtaining wetland permits. New conducted a wetland delineation of the property in 1995 and issued a report in 1996. Wetlands were

---

1. We heard oral argument in this case on January 13, 2011, in Indianapolis. We commend counsel for their outstanding oral and written presentations.

determined to exist on the northwest corner of the property, which was west of the land that B & B would ultimately acquire. Another wetlands area existed in the northeast area of the property that was east of that property.

Although the area that B & B would purchase was dominated by wetland plants and wetland soil, New believed that the area did not have wetland hydrology at that time. As a result, New decided to classify the area as uplands, and the Army Corps agreed with that assessment.

A problem developed with Pruim's plans to develop the balance of the site into an industrial park. It was determined that much of the property lay within the floodway and Burn's Ditch that runs along the southern border of the property. As a result, the property was very difficult, if not impossible, to develop. New had been working with LEL to develop a concept to build a wetlands mitigation bank[2] in northwest Indiana.

LEL purchased the mitigation bank property from Pruim in October 1997. The original intent had been to purchase the property all the way up to 15th Avenue on the north. However, Pruim decided to keep a strip of land along 15th Avenue. Although the mitigation bank property is a relatively flat area, the land along 15th Avenue that eventually became the B & B property sits on a slope. The property slopes downward from 15th Avenue going south toward the mitigation bank.

Pruim's decision to retain the property along 15th Avenue became problematic because the southern portion of the property was at essentially the same elevation as the mitigation bank property. Consequently, in raising hydrology to restore the mitigation bank property to wetlands, it was possible that the southern portion of the land that was retained could return to a wetlands area.

To resolve this problem, LEL contracted with Pruim, whereby Pruim agreed to allow LEL to raise the water level on the north end of the property being purchased to an elevation of 591.5 feet. At some point, Pruim transferred what was to become the B & B parcel to Tressmer. B & B then purchased the property from Tressmer in 2001, with the intention of operating a concrete crushing and recycling facility. Lying to the immediate south of this property were the two mitigation bank parcels that LEL owned. The southern part of B & B's property is at the same elevation as LEL's property. The remainder of the land gradually rises in elevation to a level a few feet higher than the lower land.

After B & B obtained permits from the City of Lake Station to begin operating the recycling plant, a large amount of broken concrete was dumped onto its land. It was intended that a concrete crusher would be brought onto the property to crush the concrete so as to be suitable for sale and re-use as roadbed material.

Before the mitigation bank was developed, LEL obtained the necessary permits and approvals from the Army Corps and the Indiana Department of Environmental Management (IDEM). Dr. Greg Olyphant, a specialist in wetland hydrology,

---

**2.** A wetlands mitigation bank is a parcel of land upon which new wetlands are created by promoting the growth of wetlands vegetation upon suitable soils with adequate hydrology. Once established, wetland credits can be sold from the bank to persons or entities in need of the credits in the development of their own parcels of land. These individuals can effectively mitigate their damage to the environment by creating replacement wetlands for those destroyed. The process is subject to regulatory approval and is overseen by the Army Corps. Appellant's App. p. 10.

was retained by LEL to perform the hydrologic assessment. He initially visited the site in the fall of 1997 or spring of 1998 regarding the area's potential as a restored wetland. Soil borings were performed and monitoring wells were installed at various locations on the mitigation bank property.[3]

From 1998 through 2002, LEL removed field tiles from the mitigation bank, built berms along the boundaries, and placed a ditch plug and water control structure in a north/south ditch that runs down the eastern portion of the property. In March 1998, LEL was informed that "it is apparent that the proposed mitigation bank is likely to inundate the property to the northwest of the applicant." Ex. 15, Tr. p. 139. The removal and destruction of the farm drainage system, which included the removal of clay tiles and plugging of the ditch in 1999–2000, caused the water table to rise. In fact, during the course of obtaining various permits and credits for the mitigation bank, LEL was notified that raising the water table to exceed 591.5 feet above sea level would potentially flood neighboring properties.

When B & B's expert, Robert Montgomery, was at the property in 2007, he noticed that the land was "real wet," and there was standing water on the surface of the south end of B & B's property, which is at approximately the same elevation as the north end of the mitigation bank property. Tr. p. 215–16, 228. That water level was 590.7 feet on the LEL property and the south end of the B & B property. This was less than the maximum water surface elevation of 591.5 feet that the Army Corps had recommended.

When the Army Corps determined that a violation was occurring on B & B's property in July 2002, the ground water level measured 591.95 feet, which was virtually identical to the June 1998 measurement. During the inspection of the property, Army Corps representative Steven Sprecher noted that there was concrete construction debris approximately ten to fifteen feet high piled over an area approximately 250' × 350' as well as two piles of sand approximately 50' × 50' × 10' high. Ex. 36, Tab 42.

William Carlson of B & B was present at the site with Sprecher. They walked up on top of a pile, approximately 15' to 20' tall, and Sprecher pointed out tall weeds on the southern part, determining that they were wetlands. Carlson subsequently received a letter dated July 16, 2002, from the Army Corps, advising that the concrete crushing operation was partially in wetlands. Thus, the Army Corps advised B & B to cease and desist from conducting any further unauthorized activities on the property because B & B had filled in some of the wetlands. However, B & B continued to bring in concrete during the fall of 2002 and the spring of 2003.

In November 2004, B & B applied for an after-the-fact permit so it could continue the concrete crushing and recycling operations.[4] However, the Army Corps did not issue a decision on the after-the-fact permit, thus the property remained subject to the cease and desist letter.

On May 19, 2008, B & B filed a complaint for damages against LEL. B & B claimed that LEL, in an attempt to create

---

3. A "boring" is a core of sediment to determine the geology under the ground. The monitoring wells are tubes, or PVC pipe, going down in the ground to study hydrology. These wells have a certain amount of "stick up," where the PVC pipe sticks up above the ground. Tr. p. 512.

4. 33 C.F.R. § 331.11 requires an after-the-fact permit applicant to sign a tolling agreement.

a wetland on its own property, caused a wetland to be formed on B & B's property. As a result, B & B sought damages for lost profits, clean-up costs, and the lost value of its land.

A jury trial was conducted on February 8, 10, 11, and 15, 2010. At the close of B & B's case in chief, the trial court granted judgment on the evidence in favor of LEL on B & B's claims for negligence and trespass pursuant to Indiana Trial Rule 50. The trial court determined that B & B's cause of action was barred by the common enemy doctrine. And following the presentation of all the evidence, the trial court granted judgment on the evidence in LEL's favor on B & B's remaining claim for nuisance.

The trial court's judgment of February 16, 2010, provided that

[T]he common enemy doctrine, pertaining to the right of landowners to take action in regard to surface water, applies in this case, and that the doctrine was not waived for failure to plead as an affirmative defense. Rather, the Defendant's argument based upon the common enemy doctrine is merely an answer in response in denial that its conduct was not a nuisance. Further, even if the matter were an affirmative defense, the common enemy doctrine was clearly in issue in this trial, evidence and arguments have been presented, and it should be treated as if raised in the pleadings.

The Court finds that the evidence is insufficient to support the Plaintiff's claim against the Defendant because the common enemy doctrine precludes the Plaintiff's recovery as a result of the Defendant's conduct. Considering only the evidence favorable to the Plaintiff, the Defendant's conduct caused the surface water on its property to accumulate and not flow off in volume as it had done previously. The surface water on the Defendant's property was either a result of precipitation or the flow of surface water and groundwater off the Plaintiff's property. Once the Defendant began retaining the surface water, pursuant to the permit it was given by the Army Corps of Engineers, the Plaintiff (or its predecessor in interest) had the opportunity, right, and responsibility to take whatever action deemed appropriate to combat the retention of surface water on its land.

The same reasoning and rationale applies to Plaintiff's claim that raising the groundwater table on the Defendant's property caused the groundwater on Plaintiff's property to rise. There is no evidence that Lake Erie Land Company acted maliciously, or that its actions were done gratuitously. Further, as witnesses testified, surface water flows downhill from the Plaintiff's land onto the Lake Erie Land Company's land. The groundwater also necessarily flows from higher levels on the Plaintiff's land down to the Defendant's land. That the level of ground water on the Plaintiff's land after completion of the wetlands mitigation bank differs from the level before was also a matter for which the Plaintiff (or its predecessors in interest) had the opportunity, right, and responsibility to take action to remedy when first discovered.

Because the evidence viewed in the light most favorable to the Plaintiff does not support a claim against the Defendant, the Defendant's motion for judgment on the evidence must be granted and the case withdrawn from the jury's consideration.

Appellant's App. p. 11–12. B & B now

appeals.[5]

## DISCUSSION AND DECISION

### I.   Standard of Review

■ In reviewing a ruling on a motion for judgment on the evidence, we note that the purpose of a motion for judgment on the evidence is to test the sufficiency of the evidence, and the grant or denial of a motion for judgment on the evidence is within the broad discretion of the trial court and will be reversed only for an abuse of that discretion. *Northrop Corp. v. Gen. Motors Corp.*, 807 N.E.2d 70, 86 (Ind.Ct.App.2004).

[2, 3] When reviewing a trial court's ruling on a motion for judgment on the evidence, we use the same standard as the trial court. *Faulk v. Nw. Radiologists, P.C.*, 751 N.E.2d 233, 238 (Ind.Ct.App. 2001). The evidence is considered in light most favorable to the non-moving party. *Id.* We will not substitute our judgment for that of the jury on questions of fact. *Id.* We determine only: (1) whether there exists any reasonable evidence supporting the claim; and (2) if such evidence does exist, whether the inference supporting the claim can be drawn without undue speculation. *Stowers v. Clinton Cent. Sch. Corp.*, 855 N.E.2d 739, 747 (Ind.Ct.App.2006).

### II.   B & B's Claims

Although the trial court based its decision on the application of the common enemy doctrine, the first issue that we address is whether the judgment must be set aside because LEL never raised the common enemy doctrine as an affirmative defense. In the alternative, B & B argues that the trial court erred in granting LEL's motion for judgment on the evidence because it erroneously applied the common enemy doctrine in these circumstances. Put another way, B & B claims that LEL should not be permitted to avoid liability for raising the subterranean water table on its land, causing B & B's property to become a federally regulated wetland. Indeed, B & B contends that it presented evidence establishing a prima facie case that LEL breached a duty not to raise the water table so far above sea level. Thus, B & B contends that its claims against LEL should have been permitted to proceed.

### A.   Affirmative Defense

B & B asserts that the trial court's judgment was erroneous because there is no pleading, document, or other written evidence suggesting that the common enemy doctrine was ever raised as a defense prior to the close of its case-in-chief. B & B further maintains that there was no evidence that the common enemy doctrine was raised at any time during discovery or at trial. As a result, B & B maintains that the trial court erred in determining that this issue was tried by consent.

■ In resolving this issue, we note that under Indiana Trial Rule 8(C), a responsive pleading is required to set forth affirmatively all defenses and matters "constituting an avoidance." The failure to do so results in waiver. *Molargik v. W. Enters., Inc.*, 605 N.E.2d 1197, 1199 (Ind.Ct.App. 1993).

■ The common enemy doctrine, which is explained in greater detail below, generally provides that surface water that

---

5.   LEL has filed a motion to strike the contention and argument in B & B's reply brief that LEL misstated the testimony of witness John McQuestion regarding the presence of cattails in non-wetland areas. Contrary to B & B's claim, McQuestion testified that he "typically find[s] cattail in any type of upland situation." Tr. p. 343. Thus, we now grant LEL's motion to strike.

does not flow in defined channels is a common enemy and "each landowner may deal with it in such a manner that best suits his own convenience." *Argyelan v. Haviland,* 435 N.E.2d 973, 975 (Ind.1982). Contrary to B & B's contentions, surface and ground water have been at issue at all times during this litigation. In fact, a memorandum from the Army Corps in 1998 recommended modification of the existing plans for the mitigation bank to prevent water surface elevations from exceeding 591.5 feet. Ex. 15, Tab 18. And B & B presented that document to LEL early in the discovery process in response to a Request for Production of Documents.

Also, during B & B's case-in-chief, its counsel extensively examined both LEL representative Donald Ewoldt and B & B's expert, Robert Montgomery, concerning water levels on the ground surface and the effects of water elevation when the property was inspected in 2007. Tr. p. 199, 208. B & B's counsel also questioned Ewoldt about the issue of flooding the neighboring property at 591.5 feet and where the water level would be on the surface of B & B's property.

In light of this evidence, it is apparent that B & B offered evidence at trial that related to surface water issues and it failed to object to any pretrial evidence that LEL submitted on those issues. Therefore, even assuming without deciding that the common enemy doctrine is an affirmative defense that should have been specifically pled in its answer, the record demonstrates that the issues relating to the common enemy doctrine and surface waters were tried by the parties' consent. As a result, B & B's arguments for reversal on this basis fail.

### B. The Common Enemy Doctrine and LEL's Alleged Breach of Duty

In the alternative, B & B claims that the trial court erred in granting LEL's motion for judgment on the evidence because it erroneously applied the common enemy doctrine in these circumstances. More specifically, B & B claims that the water in question is groundwater and the common enemy doctrine applies only to surface water.

Water that is classified as surface water is governed by the common enemy doctrine. *Kinsel v. Schoen,* 934 N.E.2d 133, 139 (Ind.Ct.App.2010). As noted above, our Supreme Court has observed that

> In its most simplistic and pure form the rule known as the "common enemy doctrine," declares that surface water which does not flow in defined channels is a common enemy and that each landowner may deal with it in such manner as best suits his own convenience. Such sanctioned dealings include walling it out, walling it in and diverting or accelerating its flow by any means whatever.

*Argyelan,* 435 N.E.2d at 975. The common enemy doctrine may apply regardless of the form of action brought by the plaintiff, that is, regardless of whether the plaintiff asserts his claims as an action for negligence, trespass, or nuisance. *Kinsel,* 934 N.E.2d at 139. However, the common enemy doctrine applies only to surface water. *Trowbridge v. Torabi,* 693 N.E.2d 622, 627 (Ind.Ct.App.1998). Thus, if the water in this case is characterized as surface water, the common enemy rule may apply and preclude B & B's damage claims. *Id.* at 628.

In discussing the concept of "surface water," we recognized in *Trowbridge* that

> As distinguished from the waters of a natural stream, lake, or pond, surface waters are such as diffuse themselves over the surface of the ground, following

no defined course or channel, and not gathering into or forming any more definite body of water than a mere bog or marsh. They generally originate in rains and melting snows[....] Water derived from rains and melting snows that is diffused over surface of the ground [is surface water], and it continues to be such and may be impounded by the owner of the land until it reaches some well-defined channel in which it is accustomed to, and does, flow with other waters, or until it reaches some permanent lake or pond, whereupon it ceases to be "surface water" and becomes a "water course" or a "lake" or "pond," as the case may be.

*Id.* at 627. Put another way, water from falling rains or melting snows that is diffused over the surface of the ground or which temporarily flows upon or over the surface as the natural elevations and depressions of the land may guide it but which has no definite banks or channel, is surface water. *Kinsel,* 934 N.E.2d at 139.

■ All the experts in this case agreed that the main source of water upon the properties both above ground and below ground that created the regulated wetland stemmed from subterranean waters flowing from the point north of the B & B property to the Little Calumet River. Tr. p. 171–173, 313, 498–499, 508, 513, 594. As a result, it was the groundwater that was intentionally brought to the surface through LEL's actions that dispersed throughout the property. Hence, because the water in question in this instance was groundwater, it is not governed by the common enemy doctrine.

Additionally, the evidence demonstrates that LEL was not diverting water to render the land useful. Rather, it is apparent that LEL was collecting water from underground to create a wetland that spilled on to the adjoining properties. In our view, the common enemy doctrine does not permit the creation of a wetland because that type of action simply does not qualify as "water diversion." Moreover, the parties cite to no authority—and we have found none—that permits a party to stop the free flow of subterranean waters in order to raise the water table not only upon its land but on adjoining lands to create a federally regulated wetland. In our view, neither the principles applicable to subterranean waters nor the common enemy doctrine would permit a defendant to stop the free flow of underground waters so that adjoining properties become flooded.

■ Although the trial court determined that B & B had a window of opportunity to take action to counter the activity of LEL and protect itself, B & B had no notice that the property was in jeopardy of being classified as a regulated wetland until it received the cease and desist letter from the Army Corps. And by that time, it was too late.

The evidence showed that the water table only needed to reach a level within twelve inches of the surface for a short period during the year. Tr. p. 191. The expert testimony revealed that there was only a two-week period during the growing season that the water table must reach federal regulatory criteria. There was no measuring well on the property and B & B could not have known that the regulatory criteria were being reached.

We also note that there were no wetland plants on B & B's property in 1996. Hence, the property was not delineated as a wetland. And the only way that the wetland vegetation could have gotten there was through migration from the mitigation bank.

In light of these circumstances, we find applicable here the rule set forth in *Cent.*

*Ind. Coal Co. v. Goodman,* 111 Ind.App. 480, 39 N.E.2d 484, 486 (1942), where it was held that

"the person, who for his own purposes brings on his lands and collects and keeps there anything likely to do mischief if it escapes, must keep it in at his peril, and, if he does not do so, is prima facie answerable for all the damage which is the natural consequence of its escape.... It seems but reasonable and just that the neighbor, who has brought something on his own property which was not naturally there, harmless to others so long as it is confined to his own property, but which he knows to be mischievous if it gets on his neighbor's, should be obliged to make good the damage which ensues if he does not succeed in confining it to his own property. But for his act in bringing it there no mischief could have accrued, and it seems but just that he should at his peril keep it there so that no mischief may accrue, or answer for the natural and anticipated consequences. And upon authority, this, we think, is established to be the law whether the things so brought by beasts, or water, or filth, or stenches."

(quoting *Niagara Oil Co. v. Jackson,* 48 Ind.App. 238, 91 N.E. 825, 827 (1911)).

By way of analogy, the circumstances here suggest that the wetland vegetation sewn and seeded by LEL is just as damaging as the chemical discharge that occurred in *Central Indiana Coal Company.* In essence, the property is no longer suitable for any purpose other than perhaps hunting and fishing. In short, the land was rendered unproductive and useless to B & B.

Although the trial court determined that there was no evidence that the mitigation bank project had violated any applicable engineering standards, and no breach occurred in carrying out the creation of the wetland mitigation bank, LEL knew that raising the water table in excess of 591.5 feet could potentially flood neighboring properties. Tr. p. 208, 652–63. LEL was also warned that the mitigation bank would likely inundate B & B's land and its permit prevented it from injuring adjoining property owners. *Id.* at 139. These facts notwithstanding, LEL increased the water level as part of its design criteria in order to sell more mitigation credits. *Id.* at 147.

An engineer who worked for New testified that a major consideration in choosing any wetland restoration site is to protect adjoining landowners in order to avoid situations that resulted here. *Id.* at 597–98. Moreover, John McQuestion, a certified professional soil scientist who testified for B & B, testified that LEL could have employed three methods to stop the propagation of the wetland onto B & B's property. Those methods included. digging a ditch, filling in the north side of the mitigation bank, or applying a herbicide on a periodic basis. *Id.* at 243–44. However, there was no evidence that LEL took any of these measures. Moreover, LEL's experts explained that the company erected berms along the property that kept the water contained, removed drain tiles, and plugged a ditch. *Id.* at 190, 201, 205. The effect of these actions was to back the water up so that it would pool on to B & B's property. No evidence in the record indicates that B & B knew that wetland hydrology and vegetation existed on its property or that it was aware of some precaution that had to be taken to protect against regulation by federal authorities. In short, B & B could not have defended itself against the water in light of the cease and desist order that it received from the Army Corps.

Therefore, in addition to our conclusion that the common enemy doctrine does not bar B & B's cause of action against LEL, it is also apparent that B & B presented sufficient evidence in its case-in-chief that LEL undertook a duty and breached that duty by not stopping the propagation of wetland species that culminated in the establishment of the wetlands on B & B's parcel.

### III.  Trespass

B & B also argues that the trial court erred in determining as a matter of law that no trespass existed.  Specifically, B & B maintains that the trial court was "mistaken in its belief that some *person* had to be the object of the trespass."  Appellant's Br. p. 25 (emphasis added).

Instructive here is this court's opinion in *Lever Bros. Co. v. Langdoc,* 655 N.E.2d 577 (Ind.Ct.App.1995), where a residential landowner brought suit after a heavy rain flooded the basement and the owner noticed a white fatty substance in the basement identical to a substance that had been extracted from the landowner's drain on a prior occasion.  *Id.* at 580.  One of the issues on appeal was whether or not a trespass could occur as a result of the entry of noxious materials onto another's property.  The trial court determined that it could.

We held that an action for trespass requires the plaintiff to prove that he was in possession of the land and that the defendant entered the land without right.  *Id.* at 582.  In reaching that conclusion, we set forth the Restatement (Second) of Torts § 165, (1965), that provides

> One who recklessly or negligently, or as a result of an abnormally dangerous activity, enters land in the possession of another or causes a thing or third person so to enter is subject to liability to the possessor if, but only if, his presence or the presence of the thing or the third

person upon the land causes harm to the land, to the possessor, or a thing or a third person in whose security the possessor has a legally protected interest.

Although no Indiana case had previously considered the issue of whether the entry of noxious material onto another's property constitutes a trespass, we observed that other jurisdictions have determined that a trespass could occur if there was a direct causal relation between the actor's conduct and the intrusion of the foreign matter upon the possessor's land that caused the harm.  *Id.* at 582.  Finally, we concluded that the trial court did not err in determining that a negligent trespass existed because the landowner had suffered property damage as a result of the substance that had seeped from her basement drain that was caused by the defendant's discharge of prohibited materials into a public sewer system.  *Id.* at 582.

Although we note that the seeds that migrated onto B & B's property are not "noxious materials" per se, they rendered B & B's property subject to federal regulatory criteria.  And, as discussed above, once the plants migrated and took root, the B & B property "became worthless." Appellant's Br. p. 26.  Therefore, in accordance with *Lever Bros.,* we reject LEL's contention that B & B failed to present any evidence of trespass.

### CONCLUSION

In light of our discussion above, we conclude that the issues pertaining to groundwater and surface water that related to the common enemy doctrine were tried by the parties' consent, even though LEL did not raise the doctrine as an affirmative defense.  Moreover, because the water in question in this instance was groundwater, B & B's action against LEL was not precluded by the common enemy doctrine.  B

& B presented sufficient evidence in its case-in-chief establishing that LEL undertook a duty and breached that duty by not stopping the propagation of wetland species that culminated in the establishment of the wetlands on B & B's parcel. Finally, we conclude that B & B presented sufficient evidence to support a claim for its causes of action against LEL. Thus, the trial court erred in granting LEL's motion for judgment on the evidence.

The judgment of the trial court is reversed and remanded for further proceedings consistent with this opinion.

DARDEN, J., and BRADFORD, J., concur.