**David LONG and Connie Long, Appellants–Plaintiffs**

v.

**IVC INDUSTRIAL COATINGS, INC., MacDougall & Pierce Construction, Inc., J.B. Quinn, Feutz Contractors, Inc., C.H. Garmong & Son, Inc., and Hannum, Wagle & Cline Engineering, Appellees–Defendants.**

No. 11A05–0812–CV–710.

Court of Appeals of Indiana.

July 2, 2009.

Gerald H. McGlone, McGlone Law, Terre Haute, IN, Attorney for Appellants.

Peter J. Sacopulos, Sacopulos Johnson & Sacopulos, Terre Haute, IN, Attorney for IVC Industrial Coatings, Inc.

Bryce Zoeller, Eric D. Johnson, Kightlinger & Gray, LLP, Indianapolis, IN, Attorneys for J.B. Quinn and Feutz Contractors.

Paul T. Belch, Travelers Staff Counsel, Indianapolis, IN, Attorney for MacDougall & Pierce Construction.

## OPINION

BROWN, Judge.

David Long and Connie Long appeal the trial court's grant of summary judgment to IVC Industrial Coatings, Inc. ("IVC"), MacDougall & Pierce Construction, Inc. ("MacDougall"), J.B. Quinn, Feutz Contractors, Inc. ("Feutz"), C.H. Garmong & Son, Inc. ("Garmong"), and Hannum, Wagle & Cline Engineering ("Hannum," and together with IVC, MacDougall, Quinn, and Garmong referred to collectively as "IVC/Contractors"). The Longs raise several issues, which we revise and restate as whether the trial court erred by granting summary judgment to IVC/Contractors. We reverse and remand.

The facts in the light most favorable to the Longs follow. The Longs have owned a parcel of land located on the east side of County Road N. 300 E. in Clay County, Indiana since about 1978. The Longs constructed two farm ponds on their property in 1985 or 1986 and stocked the ponds with fish. The two ponds were fed by several water sources, including natural springs in each of the ponds and rainwater runoff from nearby railroad tracks. IVC owns a parcel of land located on the west side of County Road N. 300 E. and directly across from the Longs' property. Prior to 2001, the land parcel owned by IVC was a field. Rain falling on the IVC parcel would drain into two shallow ditches and then flow to a "collection point" at the southeast corner of IVC's parcel. Appellant's Appendix at 291. The water at the collection point flowed eastward through a culvert under County Road N. 300 E., continued to move eastward along the north side of an old railroad track, then went through a second culvert under a railroad grade, and then traveled through a ravine on the Longs' property to one of the Longs' farm ponds. Water flowed from the first farm pond to the second farm pond, and then from there to Croy's Creek.

In approximately May of 2001, IVC began construction of a manufacturing facility on its property west of County Road N. 300 E. MacDougall served as IVC's general contractor for the construction project, and Feutz was hired to extend a county road along the southern boundary of IVC's parcel along an abandoned railroad right-of-way in order to provide access to a parking lot of the new manufacturing facility. At that time, J.B. Quinn was employed for Feutz as a project superintendent. The construction project involved earthwork, and "a rather large mound of earth piled up between the building and County Road 300 East." *Id.* at 201. The mound of surplus dirt was not moved be-

cause it was going to be used as part of an expansion project. The record also reveals that the project included the construction of a detention pond on the south end of IVC's property and the construction of a swale.

Between approximately July of 2001 and continuing until approximately June of 2002, when it rained, water, mud, silt, and sediment ran off of the mound of surplus dirt located on IVC's property and eventually flowed to the collection point. From the collection point, the water which contained mud, silt and sediment traveled through the culvert under County Road N. 300 E., along the railroad track, through the second culvert under the railroad grade, and down the ravine to the Longs' two ponds. The mud and sediment settled in the Longs' ponds creating buildup. During that one-year period, the Longs' ponds were muddy, which prevented any fishing in them. David Long testified the ponds were "muddy from July to the next June. I could not fish. It was just solid mud. It did not clear up a bit." *Id.* at 280. Prior to the build-up of mud, silt, and sediment, one of the Long's ponds was about twenty feet deep at its deep end and about ten feet deep at its shallow end. After the mud, silt, and sediment settled in that pond, the pond was about ten feet at its deep end and "about a foot and a half, two feet deep" at its shallow end. *Id.* at 281. The second pond was about fifteen feet deep prior to the buildup of mud, silt, and sediment and roughly eight feet deep after the buildup. The Longs explained the problems they were having regarding the buildup of mud and sediment in their ponds to IVC and MacDougall, but the erosion and sediment runoff were not controlled.

Dale Walker, a resource specialist for the Indiana State Department of Agriculture, performed on-site inspections in con-

nection with the construction project on the IVC property. Walker completed a number of on-site evaluations with respect to erosion and sediment control to determine if IVC/Contractors were in compliance with "Rule 5."[1] Walker's evaluation report dated January 16, 2002 showed that there was evidence of off-site sedimentation and that site management for erosion and sediment control was unsatisfactory. Walker's follow-up report dated April 17, 2002, in addition to noting there was evidence of off-site sedimentation and that erosion and sediment control was unsatisfactory, indicated that site conditions presented a high potential for off-site sedimentation and commented that "[n]o progress has been made since last visit." *Id.* at 240. Walker's report dated April 30, 2002 stated: "Sedimentation is leaving the site via channels along old RR right-of-way." *Id.* at 244. Additional follow-up reports on May 28, 2002 and June 4, 2002 indicated there was still evidence of off-site sedimentation. Several of Walker's reports recommended the installation and entrenchment of a silt fence.

In April 2003, the Longs filed a complaint against IVC and MacDougall. In June 2005, the Longs amended their complaint and added Quinn as a defendant. In 2007, IVC began a second construction project to expand its manufacturing facility. Garmong served as the general contractor and Hannum served as the drainage design engineers in connection with the expansion project. As a result of the expansion project, additional sediment from IVC's property was deposited in the Longs' farm ponds.

In December 2007, MacDougall filed a motion for summary judgment. In January 2008, Quinn filed a motion for summary judgment. In March 2008, IVC filed a motion for summary judgment. In May 2008, the Longs filed a response to the summary judgment motions. In June 2008, the Longs added Garmong and Hannum as defendants, and the Longs filed their Second Amended Complaint alleging that IVC, Macdougall, Quinn, Feutz, Garmong, and Hannum were negligent and that the sediment runoff constituted a nuisance and a trespass. In October 2008, the trial court granted the motion of Hannum and Garmong to join in the prior motions for summary judgment. On November 13, 2008, the trial court granted all the defendants' motions for summary judgment. In its order granting summary judgment, the trial court stated: "In reaching this conclusion, the Court finds the Plaintiffs have no cause of action because of the common enemy doctrine of water diversion." *Id.* at 15. The trial court also stated: "Further, there is no genuine issue of material fact that the mechanism that cast the mud upon Plaintiff's property was surface water and not a natural water course." *Id.* Additional facts are supplied as necessary.

The sole issue is whether the trial court erred by granting summary judgment to IVC/Contractors. Our standard of review for a trial court's grant of a motion for summary judgment is well settled. Summary judgment is appropriate only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(c); *Mangold ex rel. Mangold v. Ind. Dep't of Natural Res.,* 756 N.E.2d 970, 973 (Ind.2001). All facts and reasonable inferences drawn from those facts are construed in favor of the nonmovant. *Mangold,* 756 N.E.2d at 973. Our review of a

---

1. "Rule 5" generally governs storm water run-off associated with construction activity. *See* 327 Ind. Admin. Code 15–5.

summary judgment motion is limited to those materials designated to the trial court. *Id.* We must carefully review a decision on summary judgment to ensure that a party was not improperly denied its day in court. *Id.* at 974. Any doubt as to the existence of an issue of material fact, or an inference to be drawn from the facts, must be resolved in favor of the nonmoving party. *Cowe v. Forum Group, Inc.,* 575 N.E.2d 630, 633 (Ind.1991).

The Longs argue that the trial court erred by granting summary judgment to IVC/Contractors. Specifically, the Longs argue that the trial court erred by finding that the common enemy doctrine applies because: (A) the mechanism that cast mud upon the Longs' property was surface water and not a natural watercourse; and (B) the water contained mud, silt, and sediment.

 Water classified as surface water is governed by the common enemy doctrine. *Argyelan v. Haviland,* 435 N.E.2d 973, 976 (Ind.1982); *Pickett v. Brown,* 569 N.E.2d 706, 708 (Ind.Ct.App.1991), *trans. denied.* The Indiana Supreme Court described the doctrine as follows:

> In its most simplistic and pure form the rule known as the "common enemy doctrine," declares that surface water which does not flow in defined channels is a common enemy and that each landowner may deal with it in such manner as best suits his own convenience. Such sanctioned dealings include walling it out, walling it in and diverting or accelerating its flow by any means whatever.

*Argyelan,* 435 N.E.2d at 975. Under the common enemy doctrine of water diversion, it is not unlawful for a landowner to improve his land in such a way as to accelerate or increase the flow of surface water by limiting or eliminating ground absorption or changing the grade of the land even where his land is so situated to

the land of an adjoining landowner that the improvement will cause water either to stand in unusual quantities on the adjacent land or to pass into or over the adjacent land in greater quantities or in other directions than the waters were accustomed to flow. *Bulldog Battery Corp. v. Pica Investments, Inc.,* 736 N.E.2d 333, 339 (Ind.Ct.App.2000), *reh'g denied.* An owner of land has the right to occupy and improve it in such manner and for such purposes as he may see fit including changing the surface or by erecting buildings thereon. *Argyelan,* 435 N.E.2d at 976. The common enemy doctrine may apply regardless of the form of action brought by the plaintiff, that is, regardless of whether the plaintiff asserts his claims as an action for negligence, trespass, or nuisance. *Bulldog Battery Corp.,* 736 N.E.2d at 339; *Luhnow v. Horn,* 760 N.E.2d 621, 632 (Ind.Ct.App.2001). However, the common enemy doctrine applies only to surface water. *See Trowbridge v. Torabi,* 693 N.E.2d 622, 627 (Ind.Ct.App. 1998), *reh'g denied, trans. denied.*

 If the water here is characterized as surface water, then the common enemy rule may apply to preclude the Longs' claims for damages caused by rainwater runoff from the IVC parcel. *See Trowbridge,* 693 N.E.2d at 628; *Bulldog Battery Corp.,* 736 N.E.2d at 339. On the other hand, if the water here is a natural watercourse, then the common enemy doctrine is not applicable. *See Trowbridge,* 693 N.E.2d at 627–629; *Bulldog Battery Corp.,* 736 N.E.2d at 339; *Gasway v. Lalen,* 526 N.E.2d 1199, 1201 (Ind.Ct.App. 1988), *reh'g denied.*

*A. Surface Water or Watercourse*

 We first address the trial court's finding that there is no genuine issue of material fact that the mechanism that cast mud upon the Longs' property was surface

water and not a natural watercourse. Indiana law makes a clear distinction between water classified as surface water and water classified as a watercourse. *Trowbridge*, 693 N.E.2d at 626.

█ This court has observed that "surface water" is defined as follows:

As distinguished from the waters of a natural stream, lake, or pond, surface waters are such as diffuse themselves over the surface of the ground, following no defined course or channel, and not gathering into or forming any more definite body of water than a mere bog or marsh. They generally originate in rains and melting snows, but the flood waters of a river may also be considered as surface waters if they become separated from the main current, or leave it never to return, and spread out over lower ground. Water derived from rains and melting snows that is diffused over surface of the ground [is surface water], and it continues to be such and may be impounded by the owner of the land until it reaches some well-defined channel in which it is accustomed to, and does, flow with other waters, or until it reaches some permanent lake or pond, whereupon it ceases to be "surface water" and becomes a "water course" or a "lake" or "pond," as the case may be.

*Id.* (quoting BLACK'S LAW DICTIONARY 1427 (5th ed.1979)) (emphasis in original omitted). Surface water has also been defined simply as "water which is diffused over the natural slope of the ground, not following a defined course or channel." *Id.* (quoting *Gasway*, 526 N.E.2d at 1201). Water from falling rains or melting snows which is diffused over the surface of the ground or which temporarily flows upon or over the surface as the natural elevations and depressions of the land may guide it but which has no definite banks or channel, is

surface water. *Kramer v. Rager*, 441 N.E.2d 700, 705 (Ind.Ct.App.1982).

█ A natural watercourse is established when "surface water begins to flow in a definite direction and there is a regular channel formed with well defined banks and bottom and water flows therein, not necessarily continually but from time immemorial and for a substantial period of each year." *Lowe v. Loge Realty Co.*, 138 Ind.App. 434, 436, 214 N.E.2d 400, 402 (1966). We have also noted: "The size of the watercourse is immaterial as is the necessity of a constant water flow. It is sufficient that water from heavy rains is regularly discharged through a well defined channel in order to constitute a natural watercourse." *Trowbridge*, 693 N.E.2d at 628 (quoting *Gasway*, 526 N.E.2d at 1201 (citations omitted)). Although it is often said that a watercourse must have a defined bed and banks made by the action of the water, "[t]hese criteria are not conclusive." *Birdwell v. Moore*, 439 N.E.2d 718, 721 (Ind.Ct.App.1982). The essential characteristics of a watercourse that give it recognition as such are substantial existence and unity, regularity, and dependability of flow along a definite course. *Id.* (citing *Vandalia R. Co. v. Yeager*, 60 Ind. App. 118, 128, 110 N.E. 230, 234 (1915)). Whether a watercourse exists must be determined from the applicable facts. *See Trowbridge*, 693 N.E.2d at 628; *Birdwell*, 439 N.E.2d at 721; *see also Davidson v. Mathis*, 180 Ind.App. 524, 526, 389 N.E.2d 364, 366 (1979) (noting that we view the determination of whether the flow of water is a "watercourse" or mere "surface water" as an issue of fact).

Here, the Longs' designated evidence includes affidavits and portions of deposition testimony of David Long, Connie Long, Rick Murphy, William Beverly, and Dale Walker, along with other evidence. In his affidavit, David Long stated that

water flowed from the collection point located on the southeast corner of the IVC parcel, ran through the culvert under County Road N. 300 E. and "along the north side of the abandoned railroad grade, then through a culvert under the railroad grade, then ... into a ravine that runs through our property, then into our [farm ponds and then] down the ravine, and then on down Croy's Creek." Appellant's Appendix at 296–297. David Long also testified that the "flow of water in it has cut a ravine that gets gradually deeper as it runs from the collection point through our property." *Id.* at 297. According to David Long, the water has followed the path described above for his entire life. The Longs' property was originally owned by David Long's grandfather, then by David Long's mother, and then by David Long, who purchased it from his mother around 1978. During his deposition, David Long testified that after water went through the culvert under County Road N. 300 E., the water would travel "right down the ditch" to the second culvert under the railroad tracks. *Id.* at 279. David Long testified: "It's an open ditch. It's an open ditch and then it goes into the [railroad] culvert." *Id.* David Long also testified that the open ditch is only wet when it rains.

In his affidavit and deposition testimony, Rick Murphy, a project supervisor for MacDougall, testified that rain falling on the IVC parcel drained into shallow open ditches which would carry the rainwater to a collection point located at the southeast corner of IVC's parcel. Murphy testified that before, during, and after construction of the facility on IVC's property, water which accumulated at the collection point "then flowed via a culvert in an easterly direction under County Road N. 300 E.

and then into one of the ponds on [the Longs'] property." *Id.* at 293. Murphy also testified that the water followed this path during heavy rains. When asked if the water from the culvert under County Road N. 300 E. "flowed through a low place or ditch or water course, into Mr. Long's pond," William Beverly, the general manager of IVC in Brazil, Indiana, responded: "I would say it probably could have. There was a low—where that culvert is ... is a pretty low spot to start with." *Id.* at 176. Dale Walker also testified during his deposition that water from the collection point goes through a culvert under County Road N. 300 E. and then down "the old railroad grade down to where it crossed under another culvert onto Long's [property]." *Id.* at 216.

Construing the facts and reasonable inferences drawn from the designated facts in the Long's favor, we cannot say that a jury could not conclude that the rainwater which accumulated at the collection point on the IVC property (or in the ditches that guided the rainwater to the collection point) began "to flow in a definite direction" with "unity, regularity, and dependability" and therefore constituted a watercourse. *See Lowe,* 138 Ind.App. at 436, 214 N.E.2d at 402 (observing that a natural watercourse is established "when surface water begins to flow in a definite direction and there is a regular channel formed ...."); *Birdwell,* 439 N.E.2d at 721 (noting that the essential characteristics of a watercourse are unity, regularity and dependability of flow along a definite course). The designated evidence includes testimony that water moved through the ditches, culverts, ravines, and ponds from the IVC property, through the Longs' property, and to Croy's Creek.[2] Although

2. IVC argues that the water here must be surface water because it "was diffused over

the surface then into ditches or, some cases, over County Road 300 East." IVC's Brief at

the water may have flowed through the ditches, culverts, and ravines only when it rained, it is not necessary that the water flow be continual.[3] *See Trowbridge*, 693 N.E.2d at 628 ("It is sufficient that water from heavy rains is regularly discharged through a well defined channel"). In addition, there was testimony that the water had followed the same path for all of David Long's life. *See Gwinn v. Myers*, 234 Ind. 560, 567, 129 N.E.2d 225, 228 (1955) (testimony that channel existed as long as witness could remember supported existence of watercourse). We conclude there is a genuine issue of material fact with respect to whether the water at issue here was surface water or a natural watercourse. *See, e.g., Trowbridge*, 693 N.E.2d at 626–629 (concluding that a genuine issue of material fact existed with regard to whether water was surface water or a natural watercourse); *see also Romine v. Gagle*, 782 N.E.2d 369, 380–381 (Ind.Ct.App.2003) (concluding that the trial court did not err when it determined that water flowing from the defendant's property was a natural watercourse, as opposed to surface water, where after a rainfall water would

collect in a shallow ditch and ran from the defendant's property across the plaintiff's property and to a nearby drain), *trans. denied; Gasway*, 526 N.E.2d at 1201–1202 (holding the evidence established the presence of a natural watercourse where, for forty years, water flowed after it rained along a specific course with recognizable banks and a bottom from defendant's property on to plaintiff's property and into a culvert under a state road); *Davidson*, 180 Ind.App. at 526, 389 N.E.2d at 366 (holding that the evidence supported the trial court's determination that a natural drainage "ravine" crossing a land parcel was a "watercourse"). Therefore, summary judgment on this issue is not appropriate.

B. *Water Containing Mud*

▆▆▆ The Longs also argue that the common enemy doctrine does not apply because the water contained mud, silt, and sediment. In its order granting summary judgment, the trial court cited our decision in *Pickett v. Brown*, 569 N.E.2d 706 (Ind. Ct.App.1991), *trans. denied*, and noted that "the natural flow of water *and mud*

---

10. However, "[i]t is [ ] well settled that the water of a natural watercourse does not cease to be a part thereof, and become mere surface water, because it may overflow its ordinary channel, spread out over adjacent low ground, and flow for a distance without a defined channel, before returning to and flowing in its usual confines." *Gwinn v. Myers*, 234 Ind. 560, 564, 129 N.E.2d 225, 227 (1955). Here, although there is evidence that water may have flowed over County Road N. 300 E., rather than under it via the culvert, on a particular day, the water does not become surface water on that basis. In any event, whether the flow of water here is a watercourse or surface water as an issue of fact. *Davidson*, 180 Ind.App. at 526, 389 N.E.2d at 366.

3. In support of its argument that the water at issue is surface water, IVC observed that the "ditches did not have water continuously

flowing into them, but rather carried only rainwater runoff and were only wet during periods of rain." IVC's Brief at 10. However, as we point out above, a constant water flow is not necessary. *Trowbridge*, 693 N.E.2d at 628. In addition, the fact that the ditches carried only rainwater runoff does not mean that a watercourse did not exist. Indeed, "[a]ll water, however, or at least that with which we are concerned here, comes from rain and snow and is originally surface water." *Gwinn*, 234 Ind. at 564, 129 N.E.2d at 226 (citing *Vandalia*, 60 Ind.App. at 127, 110 N.E. at 234 ("An origin from rains and melting snow is by no means an infallible guide in determining that a certain flow of water is mere surface water ....")). Again, whether the flow of water here constitutes a watercourse or surface water as an issue of fact. *Davidson*, 180 Ind.App. at 526, 389 N.E.2d at 366.

damaged the plaintiff's property" in that case. Appellant's Appendix at 15 (emphasis in trial court's order). In *Pickett,* the defendants purchased a vacant lot uphill from the plaintiff's home. The defendants built a new home on their lot, which altered the natural flow of water and mud so that it flowed onto the plaintiff's property. 569 N.E.2d at 707. This court concluded that the common enemy doctrine applied and therefore the plaintiffs did not have a nuisance claim against the defendant. *Id.* at 708.

We acknowledge that the *Pickett* decision makes reference to the "flow of water and mud" in the facts of that case. *Id.* at 707. However, *Pickett* did not directly address whether the fact that mud along with water flowed onto the plaintiff's property affected the application of the common enemy doctrine. *Id.* at 707–708. A careful reading of *Pickett* reveals that it does not stand for the proposition that a landowner may discharge any amount or quantity of mud, silt, or sedimentary material onto a neighboring property without liability. We also note that the common enemy doctrine applies only to surface water. *See Trowbridge,* 693 N.E.2d at 626. In our view, whether mud, silt, or sediment contained in rainwater runoff is discharged in such quantities that the water ceases to be characterized as surface water is a question of fact. *See Central Indiana Coal Co.,* 111 Ind.App. 480, 39 N.E.2d 484, 487 (1942) (noting that whether the acid content of water was sufficient to occasion

damage to property or that large quantities of acid water came onto the plaintiff's land was a question of fact).[4]

Construing the facts and reasonable inferences drawn from the facts in the Longs' favor, we cannot say that a jury could not determine that the discharge here, with its large content of mud, silt, and sedimentary material, ceased to be mere surface water. From the designated facts, a jury could conclude: that a large mound of surplus dirt was left on the IVC property; that for approximately one year erosion occurred which resulted in extensive amounts of mud, silt, and sedimentary material draining to a collection point, through ditches, culverts, and ravines and into the Longs' two ponds; that IVC/Contractors took no or few steps to prevent the flow of mud, silt, or sedimentary material with water as evidenced by its repeated violations of "Rule 5;" and that a very large flow of mud or sedimentary material was deposited into the Longs' ponds causing one of the ponds to fill approximately ten feet at its lowest elevation and the other pond to fill approximately seven feet at its lowest elevation. *See, e.g., Wells v. State Highway Comm'n,* 503 S.W.2d 689, 692–693 (Mo. 1973) (holding that the jury could find that the enormous content of mud (with water) discharged from the defendant's site and deposited into the plaintiff's lake over an extended period of time was not

---

4. The Longs also argue that the mud contained in the water here constituted a pollutant and thus the common enemy doctrine does not apply. The Longs assert that "Since mud was not a point of contention [in *Pickett*], and since it was not discussed and had no effect on the Court's decision, the case is not authority for the proposition that the common enemy rule protects pollutants, such as mud, or that mud cannot be a pollutant." *See* Appellant's Reply Brief at 4. However, we note that a determination of whether mud constitutes a pollutant is not necessary to avoid application of the common enemy doctrine. To avoid application of the doctrine, it is necessary to show only that the water at issue is not surface water. *See Trowbridge,* 693 N.E.2d at 626. Nevertheless, we observe that *Pickett* does not hold that mud, silt, or sedimentary material can never constitute a pollutant.

classified as a discharge of surface water); *see also McIntyre v. Guthrie,* 596 N.E.2d 979, 982–983 (Ind.Ct.App.1992) (holding that landowner's alleviation of a surface water problem affected a watercourse and that the impact on the watercourse was not minimal, so the common enemy doctrine did not apply), *trans. denied.* Therefore, summary judgment on this issue is not appropriate.

For the foregoing reasons, we reverse the trial court's grant of summary judg-ment to IVC/Contractors and remand for proceedings consistent with this opinion.

Reversed and remanded.[5]

CRONE, J., and BRADFORD, J., concur.

---

5. The Longs also argue that the trial court erred in granting summary judgment to IVC/Contractors on the basis that the Longs are non-riparian owners. However, because we reverse the trial court's grant of summary judgment on other grounds, we need not address whether the Longs are non-riparian owners. Moreover, we note that resolution of this issue may be affected by the fact-finder's determination of whether the water containing mud, silt, and sedimentary material at issue in this case constituted mere surface water.