

FILED

Feb 05 2016, 8:49 am

CLERK
of the supreme court,
court of appeals and
tax court

**ATTORNEYS FOR APPELLANT**

C. Gregory Fifer
Applegate Fifer Pulliam LLC
Jeffersonville, Indiana

Robert G. Bottorff, II
Jeffersonville, Indiana

**ATTORNEYS FOR APPELLEES**

William Edward Jenner
David R. Sutter
Jenner Pattison Sutter & Wynn LLP
Madison, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Liter's of Indiana, Inc.,

*Appellant-Plaintiff,*

v.

Earl E. Bennett and Daniel L. Bodine,

*Appellees-Defendants.*

February 5, 2016

Court of Appeals Cause No. 39A05-1408-PL-401

Appeal from the Jefferson Circuit Court

The Honorable Alison T. Frazier, Special Judge

Cause No. 39C01-0702-PL-84

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Plaintiff, Liter's of Indiana, Inc. (Liter's), appeals the trial court's judgment entered pursuant to a jury's verdict in favor of the Appellees-Defendants, Earl Bennett (Bennett) and Daniel Bodine (Bodine) (collectively, the Appellees).

We affirm, and remand with instructions only as to the issuance of permanent injunction with regards to the trespass claim.

## ISSUES

Liter's raises three issues on appeal which we restate as follows:

(1) Whether the common enemy doctrine precludes the Appellees' negligence claim against Liter's;

(2) Whether the trial court abused its discretion in admitting certain expert testimony; and

(3) Whether the jury awarded inadequate damages on Liter's trespass claim.

## FACTS AND PROCEDURAL HISTORY

Around 1982, Bennett and his father purchased 27.25 acres in Hanover, Jefferson County, Indiana (Appellees' Property). The existing home on the property served as Bennett's home. In 1992, Bodine, Bennett's half-brother, inherited his father's one-half interest in the Appellees' Property, thereby making him a joint owner. The land adjoining to the east was owned by Richard Clem (Clem). Clem had developed the furthest east side of his property with residential housing and named it Jefferson Manor, Phase I. The

western portion, which was approximately 28.072 acres and abutted the Appellees' Property, remained undeveloped, and in early 2006, Clem accepted Liter's, a construction service company, offer to purchase these remaining 28.072 acres (Liter's Property). The Appellees' and Liter's Properties were bordered on the south by Highway 62, and the Appellees' Property and Liter's Property now shared a boundary line. In the middle of the two Properties, there was a shallow ditch on the boundary line and after a rainfall, water would collect in the ditch and run south from the Liter's Property to the Appellees' existing twelve-inch culvert and flow out through Highway 62.

[5] LQI Development, Inc. (LQI), a company owned by Liter's, projected to develop the Liter's Property into a residential subdivision comprising of sixty three lots. The subdivision was to be known as Jefferson Manor, Phase II. Embarking on its plan, on March 20, 2006, Liter's hired Blankenbeker & Son Land Surveyors Inc. (Blankenbeker) to conduct a boundary survey. Consequently, Liter's applied for a preliminary plat from the City of Madison Plan Commission (the Commission). On May 1, 2006, an advisory hearing was held to consider Liter's application. During the meeting, an issue arose regarding drainage on Liter's Property, and the Commission directed Liter's, through its engineers, to consider constructing a detention basin so as to relieve "down-stream neighbors" from flooding. (Transcript p. 884). On a follow-up meeting held on July 6, 2006, Liter's attorney informed the Commission that Liter's would procure a drainage easement from its neighbors prior to the

Commission's approval of the final plat. At the close of the meeting, the Commission approved Liter's preliminary plat.[1]

Liter's believed that the Appellees had encroached on its property because: (1) the eaves of Bennett's roof visibly extended "by two feet" on its property, (2) Bennett's driveway trees sat on Liter's Property, (3) and Bennett's satellite dish was rooted on Liter's Property. (Appellant's App. p. 112). In addition, each time Bennett mowed the grass bordering the boundary line, he would trespass on Liter's Property. (Appellant's App. p. 112). On September 25, 2006, Blankenbeker completed its initial survey, which did not confirm the aforementioned alleged encroachments. On October 26, 2006, Blankenbeker revised the initial survey. Again, the alleged encroachments were undetected. Still, in the same month and in an effort to resolve the impending drainage issue raised by the Commission, Liter's approached the Appellees seeking to construct a retention basin[2] on the Appellees' Property. The Appellees rejected Liter's proposal.

---

[1] The record shows that in November 2007, the Commission approved the final plat.

[2] Section 5 of the Madison County Stormwater Drainage Ordinance defines a retention basin as a storm water storage facility without a defined/constructed discharge point.

[7] On January 16, 2007, through a letter, Liter's once again approached the Appellees and offered $2,500 in exchange for the grant of an easement to construct a storm water detention basin[3] on the Appellees' Property. In addition, Liter's proposed to execute an easement in favor of the Appellees, thus providing them with an access strip which would allow Bennett to walk and mow around his house without trespassing on the Liter's Property, and to also keep the unpermitted encroachments. On the same day, the Appellees, through their lawyer, rejected that offer. Following that rejection, Liter's commissioned Blankenbeker to commence plans to build a detention basin on its property.

[8] Since prior surveys did not reveal the encroachments, Liter's instructed Blankenbeker to conduct a third survey, which was finalized on February 5, 2007. That survey confirmed Liter's allegations, and consistent with those findings, on February 7, 2007, Liter's filed a Complaint seeking to enjoin and recover damages for the continuing trespass on its property. On April 3, 2007, the Appellees counterclaimed, alleging nuisance since Liter's had erected a spite

---

[3] Section 5 of the Madison County Stormwater Drainage Ordinance defines a detention basin as a facility constructed or modified to restrict the runoff of storm water to a prescribed rate, and/or to detain excess waters that accumulate upstream from the outlet.

fence[4] which deprived them of light and air. On April 23, 2007, Liter's filed its response stating that the chain link fence could not reasonably deprive the Appellees of light and air. On January 14, 2009, following leave of court, the Appellees amended their Counterclaim to contend that Liter's had negligently designed its subdivision and that the post-development surface water runoff from the Liter's Property would flood the Appellees' Property. In the same month, Liter's filed its response.

[9] Almost two years later, on December 6, 2010, Liter's filed a motion for summary judgment on the Appellees' negligence claim and on Liter's trespass claim. In support of its motion, Liter's argued that Indiana's common enemy doctrine—which provides that surface water that does not flow in defined channels is a common enemy, and each landowner may deal with it in such a manner as best suits his own convenience—applied; therefore, it could not be liable for negligence. On its trespass claim, Liter's argued that the facts were unrebutted. The Appellees' sole rebuttal to Liter's assertion that the common enemy doctrine barred their claim was that the doctrine was abrogated by the adoption of Indiana Code section 36-9-27-69.5—which provides in part: (1) that

---

[4] Indiana Code section 32-26-10-1, titled "Description of Spite Fence," defines as a nuisance "a fence unnecessarily exceeding six (6) feet in height, maliciously erected . . . for the purpose of annoying the owners or occupants of adjoining property."

a drainage plan must maintain the amount of drainage through the tract that existed when the tract was created; (2) the plan may not change locations where surface water enters the tract and exits the tract; and (3) water that sheds off a new structure especially when the new structure is elevated or near a property line or both must exit the tract in the same location where it did when the tract was created. A hearing on the summary judgement motion was held on November 21, 2011, and the trial court took the matter under advisement. Without issuing specific findings, on March 5, 2012, the trial court summarily found there were genuine issues of material fact that precluded a disposition.

[10] Following the denial of Liter's summary judgment motion, on June 12, 2012, the Appellees filed their Second Amended Counterclaim, adding a third claim pursuant to Indiana Code section 36-9-27-69.5 which provides requirements for drainage plans when subdividing lots. In addition, the Appellees sought a declaratory judgment in the interpretation and application of Indiana Code section 36-9-27-69.5 to the case. On November 26, 2012, following a hearing, the trial court determined that Indiana Code section 36-9-27-69.5 was inapplicable to the case and it dismissed the Appellees' third claim.

[11] On March 5, 2014, Liter's filed a motion seeking to dismiss portions of the Appellees' Second Amended Counterclaim. On June 4, 2014, the trial court entered an order granting in part and denying in part Liter's motion. Specifically, the trial court dismissed paragraph 4(b) of the Appellees' negligence claim alleging that Liter's had negligently and carelessly designed its subdivision by using a land surveyor instead of a registered engineer.

Nevertheless, the trial court declined to dismiss paragraph 4(e) wherein the Appellees had claimed that Liter's had negligently designed its subdivision in a manner that would lead to an increased drainage burden upon the Appellees' Property.

[12] The only remaining claims at the time of trial were: (1) Liter's trespass claim regarding the eaves of Bennett's roof encroaching its property; (2) the Appellees' nuisance claim with respect to the spite fence; and (3) the Appellees' negligence claim alleging that:

> 4. [Liter's] . . . had negligently and carelessly designed its subdivision in the following particulars:
>
> * * * *
> c. Designed a subdivision and ponding system where surface water will be collected into a body and discharged into the [Appellees' Property];
> d. Designed and created a nuisance by creating a private pond or a common private pond;
> e. Designed and created a subdivision that will increase drainage burden upon lower land owners including the [Appellees]; and
> f. Failed to use their own property so as not to cause unnecessary injury to [Appellees' Property].
>
> 5. As a proximate result of the negligence [] the [Appellees' Property] has been seriously devalued and will be subject to flooding and destruction . . . .

(Appellant's App. p. 234).

[13] A six-day jury trial was held from July 22-July 28, 2014. With regards to the trespass claim, at time of trial, the satellite dish had been removed, but the eaves of Bennett's roof remained. The Appellees' sole defense to the trespass claim

was that they had acquired the portion encroached upon through a prescriptive easement. Liter's offered unrebutted evidence that the value of its property had been reduced, thereby incurring a loss of $18,000. At the close of the evidence, Liter's moved for a directed verdict on its claim but was denied.

[14] On the nuisance issue, Bennett stated that he came home sometime in February 2007 to find a chain link fence erected on the boundary line between the two properties. Bennett indicated that it made him feel like he was being punished for rejecting Liter's propositions. Bennett's wife testified that looking through their window felt like they were in prison. Bennett acknowledged that Liter's took down the fence sometime in August of 2007. Liter's defense was that it put up the fence to establish the property line between the two properties.

[15] With regards to the Appellees' negligence claim, much of the arguments were centered on the design scale that Blankenbeker had employed in constructing the basin. The Appellees presented evidence of Robert Isgrigg (Isgrigg), an engineer who evaluated Blankenbeker's design. Isgrigg stated that a rational method is employed to calculate the dimension of the basin.[5] Isgrigg pointed

---

[5] According to the HERPICC Stormwater Drainage Manual (the Manual), the formula for the rational method is stated as Q=CIA—where Q is the peak discharge of the storm water in cubic feet per second; C is the ratio of peak runoff rate (runoff coefficient); I is the rainfall intensity; and A is the contributing area in acres.

out that the runoff coefficient factor utilized by Liter's surveyor, Blankenbeker, was too high and due to that, it led to the construction of a small detention basin. Isgrigg argued that the use of a lower coefficient would have resulted in the construction of an adequate detention basin. According to the final plat submitted to the Commission in 2007, Blankenbeker indicated that the size of the detention basin to be constructed would be 34,500 cubic feet. Isgrigg stated that during his site visit on September 19, 2008, he measured the detention basin and found that it to be 20,000 cubic feet. According to Isgrigg, an adequate detention basin should have been around 50,000 cubic feet.

[16] In addition, Isgrigg stated that the final plat showed "a 24-inch diameter culvert I believe [] under the entrance driveway on Highway 62. There is no culvert. They didn't put it in. So what happens if they've got uh . . . 300 feet of curve, streets, curved gutters, rain gutters flowing down to [the Appellees'] driveway entrance on Highway 62. . . . The water dumps into that intersection." (Tr. p. 666). During wet months, Isgrigg stated that the area would receive about "half an inch to an inch rainfall [], three or four times a month." (Tr. p. 663). Because the detention basin was too small, Isgrigg believed that the basin would fill up faster and that there would be an accelerated discharge of surface water from the Liter's Property which would, in turn, cause erosion and flooding on the Appellees' Property.

[17] The Appellees also retained a contractor, Scott Best (Best), who testified over Liter's objection that based on his experience, the detention basin seemed to be "small for the amount of property that we are dealing with" but admitted that

he was not a hydrologist or surveyor, and had not performed any calculations on which to base his opinion. (Tr. p. 781). The record shows that part of Liter's drainage system consisted of twenty-five drain pipes. Out of the twenty-five, nineteen drained into the detention basin and the remaining six drained away from the basin. Best stated that he observed several curb drains which he described as "an inlet box that is on or in a roadway that catches all the water that comes down the road." (Tr. p. 773). According to Best, there was "a pipe [] taking water from the curb drains" and directly emptying out on the Appellees' Property. (Tr. p. 775). Best indicated that said pipe was located about ten to fifteen feet from Bennett's house.

[18]     During cross-examination, Best clarified that the drain pipes did not end and empty out on Appellees' Property as earlier stated on direct, but they sat, ended and drained on the Liter's Property. Best also admitted that he did not conduct any topography review to see which path the water travels after leaving the drain pipes. Additionally, Best stated that on the day he visited the Liter's Property sometime in June 2013, the detention basin was empty and there was no water feeding through the pipes. Also, Best stated there was no standing water in the Appellees' driveway culvert, Bennett's house was still standing, and there was no visible damage to Bennett's residence.

[19]     Blankenbeker testified that the purpose of a detention basin was to "hold back the water and let it out slowly," with the goal being "to let it out at the same rate that it occurred before the development occurred." (Tr. p. 868). Blankenbeker explained that the detention basin was designed to collect the

storm water accumulations from the Liter's Property and the water was to be channeled through a weir structure, and then into a concrete swale running parallel to the boundary line between the two properties. From the swale, the water was intended to diffuse into the Appellees' existing twelve-inch culvert and flow out through Highway 62.

[20] Blankenbeker contended that in his twenty-four years of designing residential subdivisions, he had never utilized a low coefficient as that suggested by Isgrigg. In support of Blankenbeker's design, Liter's presented the testimony of a civil engineer, Bernard Hauersperger (Hauersperger), who found the runoff coefficient factor applied by Blankenbeker to be sensible. Hauersperger further testified that during his site visit, he inspected the detention basin and he determined it adequate for the sixty-three lots in Jefferson Manor, Phase II. During cross-examination, Hauersperger acknowledged that there was "ponding of water at the outlet end" of the Appellees' driveway culvert. (Tr. p. 927). He also acknowledged that "if this subdivision is fully built out [] more water will be draining onto the [Appellees' Property] than it did prior to the development." (Tr. p. 927). Despite Isgrigg's assertion that one of the pipes directly drained into the culvert, on redirect, Hauersperger explained the pipe that drained close to the Appellees' driveway culvert first drained into a swale. He further stated that the swale "would hold quite a bit of water . . . you could call it a detention facility given that the driveway pipe . . . has a restriction on the end of it. I believe it has an eight-inch [] pipe on the end of the culvert." (Tr. p. 930). Because there was a restriction on the tail end of the culvert, it

caused water to slowly discharge from the culvert and flow out into Highway 62.

[21] Bodine testified that the construction at the Liter's Property began sometime in 2008. At the time of the current trial, out of the sixty-three lots, only six lots had been developed. Bodine stated that "we've got erosion . . . underneath the driveway where one of the [] storm drains comes across our property []." (Tr. pp. 798-99). Bennett testified that before Liter's broke ground in 2008, they had never experienced water backing up "right on the brick" of his house. (Tr. p. 806). Bennett indicated that the flooding occurred at least "two or three times a year." (Tr. p. 806). Bennett stated that he would use a bush hog to mow the grass in the depression amid the two Properties, but a ditch had formed due to erosion. In addition, Bennett claimed that during a three-inch rainstorm, water would canal into one of the drain pipes that was situated about sixty feet behind his house.[6] He indicated that the water would then channel through the swale,

---

[6] Conflicting evidence was presented as to how close that pipe was situated to Bennett's house. At trial, Best testified that the said pipe was approximately ten to fifteen feet from Bennett's home. Isgrigg testified that the pipe was "roughly about [seventy-five feet]," whereas Bennett stated that the pipe was about sixty feet from his home. (Tr. p. 665).

but because the water was substantial, it would rise, overflow to his property, and backup behind his house.

[22] Additionally, the Appellees presented testimony of a licensed appraiser, Katherine Love (Love), who stated that she visited the Appellees' Property on January 3, 2011. Love stated that while conducting her survey, she explored the Property and looked exhaustively at the surroundings. Love admitted that there were no drainage issues nor did she observe erosion on the Appellees' Property. Love stated as of January 2011, the value of the Appellees' Property was $217,000. Over Liter's objection, Love was permitted to testify that the value of Appellees' Property would diminish in light of Liter's inadequate detention basin and also on the backdrop of some speculative flooding that would occur at least three times a year. Specifically, Love stated that the Appellees' Property would be devalued if it flooded three times a year, and that the Appellees would suffer damages of $134,500; therefore the new value of their Property would be $82,500. During cross-examination, Love acknowledged that she had not observed any destruction, and that her opinion on the Appellees' Property lessening in value was based on mere speculation.

[23] After six days of jury trial and close to nine hours of deliberations, the jury found for Liter's on its trespass claim but awarded no damages. On the nuisance claim, the jury found for the Appellees' but also awarded no damages. As for the Appellees' negligence claim, the jury found for the Appellees, awarding court costs and attorney's fees and directing Liter's to "make

necessary repairs to [the] drainage [].  This will prevent any and all future flooding to [the Appellees' Property]."  (Appellant's App. p. 26).

[24]  The trial court accepted the verdicts for the trespass and nuisance claims, but declined to accept the verdict on negligence, stating that it was inconsistent.  Specifically, the trial stated that the Appellees had not sought court costs and attorney's fees; as such, the award was inconsistent pursuant to Indiana Code section 34-51-2-13—providing, in part, that whenever a jury returns verdicts in which the ultimate amount awarded is inconsistent with its determinations of total damages and percentages of fault, the trial court shall inform the jury of such inconsistencies, and order it to resume deliberations to correct its verdict.  Accordingly, the trial court directed the jury to reconsider it negligence verdict, and it provided the jurors with new verdict forms to guide its determination.  Following the conclusion of those deliberations, the jury returned a verdict in favor of the Appellees, awarding damages of $51,150 each to Bennett and Bodine.  On August 25, 2014, the trial court entered an order consistent with the jury verdicts.

[25]  Liter's now appeals.  Additional information will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Common Enemy Doctrine*

[26]  The Appellees advanced a negligence claim against Liter's on the grounds that Liter's negligently designed the subdivision "in such a manner that runoff water" from the Liter's Property will discharge and flood the Appellees'

Property. (Appellant's App. p. 233). In arguing that it had no duty to the Appellees, Liter's claims that the construction of a drainage system on its property was an effort to protect its own property from the accumulation of surface waters and that the common enemy doctrine protects it from incurring any liability.

[27] We note this is an appeal from a jury trial, and "when reviewing the sufficiency of evidence in a civil case, we determine whether there is substantial evidence of probative value supporting the judgment. *Jamrosz v. Resource Benefits, Inc.*, 839 N.E.2d 746, 758 (Ind. Ct. App. 2005), *trans. denied*. We do not weigh the evidence or judge the credibility of witnesses but consider only the evidence most favorable to the judgment along with all reasonable inferences to be drawn therefrom. *Davidson v. Bailey*, 826 N.E.2d 80, 87 (Ind. Ct. App. 2005). We affirm unless the judgment "is against the great weight of the evidence." *Id.*

[28] In *Argyelan v. Haviland*, 435 N.E.2d 973, 975 (Ind. 1982), our supreme court stated:

> In its most simplistic and pure form the rule known as the "common enemy doctrine," declares that surface water which does not flow in defined channels is a common enemy and that each landowner may deal with it in such manner as best suits his own convenience. Such sanctioned dealings include walling it out, walling it in and diverting or accelerating its flow by any means whatever.

[29] In *Bulldog Battery Corp. v. Pica Investments, Inc.*, 736 N.E.2d 333, 339 (Ind. Ct. App. 2000), we clarified that under the common enemy doctrine of water diversion, it is not unlawful for a landowner to improve his land in such a way

as to accelerate or increase the flow of surface water by limiting or eliminating ground absorption or changing the grade of the land even where his land is so situated to the land of an adjoining landowner that the improvement will cause water either to stand in unusual quantities on the adjacent land or to pass into or over the adjacent land in greater quantities or in other directions than the waters were accustomed to flow. An owner of land has the right to occupy and improve it in such manner and for such purposes as he may see fit including changing the surface or by erecting buildings thereon. *Argyelan*, 435 N.E.2d at 976.

[30] An exception to the common enemy doctrine exists where an owner of land, by artificial means, throws or casts water onto his neighbor in unusual quantities so as to amplify the force at a given point or points. *Id.* Furthermore, we note that the common enemy doctrine applies only to surface water, and not to a natural watercourse. *Long v. IVC Indus. Coatings, Inc.*, 908 N.E.2d 697, 702 (Ind. Ct. App. 2009). "Surface water" has been defined as "[w]ater from falling rains or melting snows which is diffused over the surface of the ground or which temporarily flows upon or over the surface as the natural elevations and depressions of the land may guide it but which has no definite banks or channel . . ." *Kramer v. Rager*, 441 N.E.2d 700, 705 (Ind. Ct. App. 1982). Finally, we note that the common enemy doctrine may apply regardless of the form of action brought by the plaintiff, that is, regardless of whether the plaintiff asserts his claims as an action for negligence, trespass, or nuisance. *Bulldog Battery*

*Corp.*, 736 N.E.2d at 339; *Luhnow v. Horn*, 760 N.E.2d 621, 632 (Ind. Ct. App. 2001).

[31]   In *Argyelan*, the defendants erected a commercial building upon their lot, which was adjacent to the plaintiff's residential lot. *Argyelan*, 435 N.E.2d at 974. As part of the improvement to the lot, the defendants also erected downspouts directed toward the property line and paved a substantial portion of the lot. *Id.* at 975. Following completion of these improvements, the plaintiffs complained that surface water was draining from the defendants' property and pooling on their property, causing damage. *Id.* The defendants then erected a six-inch curb or retaining wall along the property line. *Id.* In a sustained rain, water would accumulate behind the curb and eventually flow over it onto the plaintiffs' property. *Id.* The supreme court held that the defendants were not liable to the plaintiffs for damage caused by the overflowing surface water pursuant to the common enemy doctrine because there was no showing that the defendants had, by artificial means, conducted the water in unusual quantities by new channels onto particular parts of the plaintiffs' land. *Id.* at 976. In so holding, the court stated that the fact that "water was once impounded or channeled [via downspouts] can be of no moment if it is diffused to a general flow at the point of entering the adjoining land." *Id.*

[32]   The Appellees now argue that the combination of having a drainage pipe that drained closely behind Bennett's house and another that drained into their driveway culvert, coupled with the construction of an undersized detention basin, caused surface water from the Liter's Property to diffuse at a greater

speed, intensity, and volume than before. In this regard, the Appellees argue that the facts place this case squarely within the exception to the common enemy doctrine—providing that the rule does not apply where an owner of land has, by artificial means, thrown or cast water onto his neighbor in unusual quantities so as to amplify the force at a given point or points. *See Argyelan*, 435 N.E.2d at 976.[7]

[33] With regards to the size of the detention basin, Liter's stated that according to the final plat submitted to the Commission in 2007, the detention basin was 34,500 cubic feet. Liter's constructed a detention basin measuring 20,000 cubic feet. The Appellees argued that an adequate detention basin should have been 50,000 cubic feet. In addition, the Appellees' retained contractor testified over Liter's objection that based on his experience, the detention basin seemed to be "small for the amount of property that we are dealing with" but admitted that

[7] The Appellees acknowledge the rule espoused in *Argyelan*; however, they point out in a footnote that they agree with the dissent in *Argyelan* and further state that "Indiana should adopt the rule of reasonable use or a modified version of the common enemy doctrine." (Appellees' Br. p. 9). We initially note that we abandoned the common enemy doctrine in favor of a different rule called the "rule of reasonable use" in *Rounds v. Hoelscher,* 428 N.E.2d 1308 (Ind. Ct. App. 1981). However, "our supreme court promptly pinned our ears back and reasserted the common enemy doctrine as the law in Indiana in *Argyelan*." *Pickett v. Brown*, 569 N.E.2d 706, 708 (Ind. Ct. App. 1991), *trans. denied.* Therefore, we respectfully decline the Appellees' invitation to reverse supreme court precedent.

he was not a hydrologist or surveyor, and had not performed any calculations on which to base his opinion. (Tr. p. 781).

[34] As for drainage pipes, Liter's drainage system comprised twenty-five drain pipes. Out of the twenty-five, nineteen drained into the detention basin and the remaining six drained away from the basin. The Appellees averred that one of those the pipes was located about ten to fifteen feet from Bennett's house, and that surface water would feed through that pipe and empty on their property. Refuting the Appellees' claim, Liter's argued that despite the existence of that pipe, surface water would first drain into a swale, the swale would then hold the water momentarily before draining into the Appellees' driveway culvert.

[35] As noted previously, under the common enemy doctrine, it is not unlawful for a landowner to accelerate or increase the flow of surface water by limiting or eliminating ground absorption or changing the grade of the land, even if it causes water to stand in unusual quantities on the adjacent land or to pass into or over the adjacent land in greater quantities or in other directions than the water did before. *Long,* 908 N.E.2d at 702 (quoting *Argyelan,* 435 N.E.2d at 976). In order to impose liability for surface water discharge, it must be collected on the Liter's Property and cast off in concentrated volumes onto the Appellees' Property. *See Argyelan*, 435 N.E.2d at 975. More importantly, the distinction lies in the character of the flow as it enters the adjoining property.

[36] "Whether surface water is collected and cast upon neighboring land as a body or collected but diffused before entering neighboring property will be largely a

question of fact." *Bulldog Battery Corp.*, 736 N.E.2d at 340. In the present case, it was the jury's role to determine whether, in light of the evidence before it, Liter's detention basin and drainage system collected water and cast it upon the Appellees' Property in unusual quantities so as to increase the force with which it entered onto the property at specific points. Considering the evidence most favorable to the verdict, as we are required to do, the evidence presented showed that the Liter's Property had a gradual fall of about 1-2%. Originally, surface water from the Liter's Property would traverse through a depression amidst the two properties and flow into the Appellees' existing driveway culvert and flow out under Highway 62. The Appellees argued that before Liter's improved its Property, they had never experienced flooding. Specifically, Bennett testified that before Liter's broke ground in 2008, he had never experienced water backing up "right on the brick" of his house. (Tr. p. 806). Also, Bodine stated that "we've got erosion . . . underneath the driveway where one of the [] storm drains comes across our property []." (Tr. pp. 798-99). Furthermore, Bennett stated that during a three-inch rainstorm, water would canal into one of the drain pipes that was situated closely behind his house and into the swale; however, since the amount of water was substantial, it would rise, overflow to its property and, backup behind his house. In addition, the jury was also presented with photographs and diagrams illustrating Liter's detention basin and drainage system; some of the photographs showed standing water, some did not.

[37] Admittedly, there was a lot of conflicting evidence offered by both parties. Some witnesses testified in a manner favorable to Liter's and others favorable to the Appellees. However, as the reviewing court, we respect the jury's exclusive province to weigh conflicting evidence. *See Davidson,* 826 N.E.2d at 87. From the evidence of the case—though not free from conflict—the jury reasonably determined that the construction of Liter's undersized basin led to the casting off of surface water in concentrated volumes onto the Appellees' Property. In this regard, we find that the common enemy doctrine does not preclude the Appellees' claim of negligence against Liter's, and we affirm the trial court.

## II. *Admission of Expert Testimony*

[38] Liter's next argues that the trial court abused its discretion in allowing the Appellees' expert witness, Love, a licensed appraiser, to render opinion testimony regarding the diminution of the Appellee's Property upon a speculative flooding event. Specifically, Liter's argues that Love's testimony regarding the Appellees' Property reducing in value was based on "pure guesswork and speculation." (Appellant's Br. p. 26).

[39] The admissibility of expert testimony is guided by Indiana Evidence Rule 702, which provides:

> (a) If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

> (b) Expert scientific testimony is admissible only if the court is satisfied that the scientific principles upon which the expert testimony rests are reliable.

[40] A witness must be qualified as an expert by his knowledge, skill, experience, training, or education and must have sufficient skill in a particular area before he may offer opinions in that area. *Armstrong v. Cerestar USA, Inc.*, 775 N.E.2d 360, 366 (Ind. Ct. App. 2002), *trans. denied*. The proponent of the expert testimony has the burden of establishing the foundation and reliability of the scientific principles on which the testimony is based. *Hannan v. Pest Control Servs., Inc.*, 734 N.E.2d 674, 679 (Ind. Ct. App. 2000), *trans. denied*. The trial court acts as a gatekeeper by preliminarily assessing whether the reasoning or methodology underlying the testimony is scientifically valid and can properly be applied to the facts in issue and by ensuring the testimony both rests on a reliable foundation and is relevant. *Armstrong*, 775 N.E.2d at 366. In other words, the trial court is to control the admission of proffered expert testimony rather than admitting what is offered and leaving it to the jury to determine the weight of the testimony. *Norfolk S. Ry. Co. v. Estate of Wagers*, 833 N.E.2d 93, 101 (Ind. Ct. App. 2005), *trans. denied*. Expert testimony admitted under Rule 702 requires more than a subjective belief or unsupported speculation. *Armstrong*, 775 N.E.2d at 366. It "must be supported by appropriate validation or good grounds based on what is known . . . ." *Lytle v. Ford Motor Co.*, 814 N.E.2d 301, 309 (Ind. Ct. App. 2004), *trans. denied*.

[41] The record shows that, in January 2011, at the request of the Appellees, Love, a certified appraiser, performed a survey of the Appellees' Property. Love indicated that her survey involved an exhaustive exploration of the Property and its surroundings. Love admitted that there were no drainage issues at the time nor did she observe erosion. Love indicated that as of January 2011, the fair market value of the Appellees' Property was $217,000. Love then responded to a hypothetical question where she stated that based on her years of experience as an appraiser, and in light of Liter's undersized basin, and upon the happening of a flooding event occurring at least three times a year, the Appellees' Property would diminish in value. Specifically, Love stated that the Appellees' Property would suffer estimated damages of $134,500. During cross-examination, Love acknowledged that she had not observed any destruction in 2011, and that her opinion was based on speculation.

[42] "Although it has been said that an expert witness must have observed facts sufficient to enable him to form a valid opinion, those facts may be supplied in the form of a hypothetical question which incorporates facts previously adduced at the trial." *Fulton Cnty. Comm'rs v. Miller*, 788 N.E.2d 1284, 1286 (Ind. Ct. App. 2003). Here, we find ample evidence in the record to provide a factual basis for the hypothetical situation on which Love's opinion was based. Bennett testified that following the development of the subdivision, water would lap up against his house approximately two to three times a year. He also indicated that the Property has experienced erosion at specific points. In addition, the Appellees presented evidence through its engineer, Isgrigg, that an

adequate detention basin should have been around 50,000 cubic feet, but Liter's had constructed a 20,000 cubic feet detention basin. Also, Isgrigg stated that the result of the undersized basin led to an accelerated discharge of surface water from the Liter's Property. Furthermore, Isgrigg pointed out that the accelerated discharge of surface water would cause erosion.

[43] While Love did not observe any flooding or damage on the Liter's Property during her visit in 2011, her expert testimony was sufficiently tied to the facts of the case and was not unreasonable or outside the scope of the evidence. *See Armstrong*, 775 N.E.2d at 366. Accordingly, we find that based upon the facts and circumstances herein, the trial court did not abuse its discretion in admitting Love's testimony.

## II. *Damages*

[44] Liter's also argues that the jury's award of zero dollars to its trespass claim was inadequate in light of the evidence. Liter's argues that this cause should be remanded to the trial court for the award of damages or, in the alternative, remanded with instructions for the trial court to grant permanent injunctive relief requiring the Appellees to remove the unpermitted portion of Bennett's roof that extends over its property.

[45] When we review a jury's damage award that the appellant claims is inadequate, we apply a strict standard. *Ritter v. Stanton*, 745 N.E.2d 828, 843 (Ind. Ct. App. 2001), *trans. denied*. Specifically, we "consider only the evidence that supports the award together with the reasonable inferences therefrom." *Id*. "If there is

any evidence to support the amount of the award, even if it is conflicting, this court will not reverse." *Id*. This standard reflects the premise that damages "are particularly a jury determination." *Sears Roebuck and Co. v. Manuilov*, 742 N.E.2d 453, 462 (Ind. 2001). Therefore, we do not substitute our "idea of a proper damage award for that of the jury." *Id*. (quoting *Prange v. Martin*, 629 N.E.2d 915, 922 (Ind. Ct. App. 1994), *trans. denied*). Because appellate courts are unable "to actually look into the minds of the jurors, . . . .we will not reverse if the award falls within the bounds of the evidence." *Sears Roebuck*, 742 N.E.2d at 462 (citation omitted); *see also Russell v. Nuemann–Steadman*, 759 N.E.2d 234, 237 (Ind. Ct. App. 2001) (stating, "[t]he trial court may only reverse a jury verdict 'when it is apparent from a review of the evidence that the amount of damages awarded by the jury is so small or so great as to clearly indicate that the jury was motivated by prejudice, passion, partiality, corruption or that it considered an improper element.'") (citation omitted).

[46] The record demonstrates that after Liter's conducted a boundary survey of its Property, it became apparent that the eaves of Bennett's roof extended over its Property by two feet. Liter's also claimed that Bennett's satellite dish was rooted on its property. In the Compliant, Liter's sought permanent injunctive relief requiring the Appellees to remove the unpermitted encroachments, and the award of treble damages due to the continuing trespass. At trial, Liter's presented unrebutted evidence that its property had been devalued by $18,000 as result of Bennett's roof extending to it property. We note that a jury is presumed to have followed the court's instructions. *Prange*, 629 N.E.2d at 922.

The jury was instructed that it could award Liter's damages that resulted from the trespass. After deliberations, the jury found that Liter's had substantiated its trespass claim, but was not entitled to damages of any kind. Also, the jury found for the Appellees on its nuisance claim but all the same denied it damages.

[47] The Appellees briefly argue that "[n]owhere did Liter's offer an objection to the jury verdict of no damages on the trespass count, and thereby waived the error, if any." (Appellees' Br. p. 17). Although not specifically mentioned by the Appellees, we note that Liter's did not file a motion to correct error after the jury verdict. Under the Indiana Rule 59(A)(2), a motion to correct error is prerequisite to appeal when a party seeks to address a claim that a jury's verdict is excessive or inadequate. Here, Liter's did not file a motion to correct error, and its argument that we should review the award of zero dollar damages as being inadequate, is waived on appeal.

[48] At the very least, Liter's seeks that we remand this cause for the issuance of a permanent injunction. We note that permanent injunctions are limited to prohibiting injurious interference with rights and must be narrowly tailored so that its scope is not more extensive than is reasonably necessary to protect the interests of the party in whose favor it is granted. *Plaza Grp. Props., LLC v. Spencer Cnty. Plan Comm'n*, 877 N.E.2d 877, 881 (Ind. Ct. App. 2007), *See* also *Soc. Serv. v. Hospitality House*, 704 N.E.2d 1050, 1061 (Ind. Ct. App. 1998). "A trial court may issue an injunction in order to prevent a continued trespass." *Ballard v. Harman*, 737 N.E.2d 411, 417 (Ind. Ct. App. 2000).

At the time of the current trial, Liter's had removed the spite fence; however, the Appellees had not removed the eaves of the roof that extended to Liter's Property. Here, we find that the continued existence of the Appellee's roof extending to Liter's property would involve a continuing trespass. According, injunctive relief is the appropriate remedy on remand. Therefore, we remand to the trial court with instructions for the issuance of a permanent injunction requiring the Appellees to remove the unpermitted portion of Bennett's roof that extends over Liter's Property.

## CONCLUSION

In light of the foregoing, we conclude that: (1) the common enemy doctrine does not preclude the Appellees' negligence claim; (2) there was no abuse of discretion in admitting Love's testimony; and (3) Liter's argument that the jury's award of zero damages is inadequate is waived on appeal; however, because there is continuing trespass, we remand to the trial court with instructions for the issuance of a permanent injunction.

Affirmed, but remanded with instructions for the issuance of a permanent injunction with respect to the continuing trespass.

Bailey, J. and Barnes, J. concur